IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

### MIDDLE DISTRICT—HARRISBURG 1865.

## Speer *versus* The School Directors, Burgess and Town Council of the Borough of Blairsville.

*Constitutionality of Act 25th March 1864, for payment of bounties to volunteers.*

1. An Act of Assembly is to be presumed constitutional, until shown to be unconstitutional by the party who alleges that it is so.

2. The courts will not declare an Act of Assembly void unless it violates the constitution, clearly, palpably, plainly, and in such a manner as to preclude doubt or hesitation.

3. A tax law is to be considered valid, unless it be for a purpose in which the community taxed has palpably no interest; and when it is apparent that the burden is imposed for the benefit of others than the public, and for another than the public interest.

4. It is a matter involving the public welfare and interest, that the quota of troops called for, from a municipal district, under an impending and unexecuted draft, should be filled by volunteers.

5. Hence the payment of bounties to volunteers to enable a borough to fill its quota under a call for troops, and an anticipated draft, is a legal payment as for a purpose of a municipal and public nature: and an Act of Assembly authorizing the borough authorities to raise money for such purpose by loans and taxation is constitutional.

6. Such a law is not within the constitutional amendment of 1857, prohibiting the legislature from authorizing municipalities to obtain money for or loan credit to any corporation, institution, or party.

APPEAL from the Common Pleas of *Indiana county.*

This was an appeal by William R. Speer, John Devinny, C. C.

(150)

[Speer *v.* School Directors, &c., of Blairsville.]

Davis, and others, from the decree of the court below dismissing a bill in equity filed by them against the school directors, burgess, and town council of Blairsville.

The prayer in the bill was to restrain them from borrowing money under the Act of March 25th 1864, which authorized the borough to contract a debt for the payment of $300 " to each non-commissioned officer and private" who might thereafter " volunteer and enter the service of the United States from such county, and be credited to the quota thereof ;" and the object of the bill was to test the constitutionality of all acts called Bounty Laws. The injunction was at first granted, but was subsequently dissolved. The complainants then appealed from the decree of the court below to the Supreme Court. The cause was argued at Philadelphia, March 10th 1865, before three of the justices of the court, and a re-argument before the full bench was ordered. Leave was subsequently granted to the city of Philadelphia to be heard by her solicitor on the constitutional question.

*Walter H. Lowrie* and *Jeremiah S. Black*, for appellants, argued that whenever there was any doubt as to the constitutionality of a law, it should be resolved in favour of the great charter itself. There was a prohibition in the law rendering it void. The legislature cannot enter a judgment, or a decree.

I. The law is repugnant to the Constitution of the United States.

II. It is an order, or decree.

III. It is in conflict with the amendments ˅to the Constitution of Pennsylvania.

No man could serve two masters at one and the same time. Congress has power to declare war, to suppress insurrections, to raise and support armies, to pass all laws needful to carry these powers into effect, and has occupied the whole ground—has fixed the amount of bounties, has distributed the burdens of war amongst those who had remained at home. A uniform tax has been laid—a full system established. That did not satisfy the legislature and a different system was enacted. Even the governor was not authorized to appoint the officers. The supervisors of townships, the school directors, the town councils, the overseers of the poor, were to suspend their ordinary duties and to assume those prescribed by the law in question. If the legislature should levy a tax to pay an additional sum to those in the civil service of the government, it would be clearly unconstitutional.

It is conceded that the *animus* of those enacting the law was not unfriendly to the Federal government. But if the legislature had any jurisdiction, they could exercise it as they pleased. They might abrogate an Act of Congress. Once the right to interfere at all shall be admitted, nothing can prevent their going the down-hill path to nullification and secession.

[Speer *v.* School Directors, &c., of Blairsville.]

The law was also most malignant in its operation.    The conduct of those acting under it, in the way authorized by it, had called forth the reprobation of all those who were really interested in upholding the government.    A new profession had been created who cheated their victims, stole and kidnapped men and put them on the auction-block and sold them, in shameless defiance of all decency.

Both governments can undoubtedly tax; but not for the same purpose.

The law in question promoted the good of certain individuals only.    The conscription of a man was his own personal debt, or burden; exactly as if his barn had been struck by lightning.    He could not then go to the legislature and have them authorize the levying of a tax on his neighbours, not for the purpose of enabling him to perform his duty, but to evade it.    The legislature had been operated upon by politicians.    These latter had called meetings all over the state, and declared they would "subscribe their last dollar."    Then they went to the legislature and said they had contracted great debts for bounties—that they had subscribed heavily and were bound to pay.    The legislature had consequently passed a law compelling others to pay these very debts contracted as described.    They might just as well have asked that some other political corporation should pay this debt.

*Howard* and *Childs*, for the appellees.—The law in question is opposed on two grounds:—

1st.  Because it was an exercise of power which did not belong to the state, but to Congress, exclusively, by the express terms of the Constitution of the United States; and

2d.  Because the law under which the defendants propose to act was in violation of the Constitution of the state, and therefore inoperative and void.

It is clearly deducible, from all the authorities, that an exclusive jurisdiction in Congress, or an entire alienation of state authority, can exist only in the following cases:—

1st.  Where the Constitution in express terms grants an exclusive authority to the Union.

2d.  Where it grants an authority to the Union, and at the same time prohibits the states from exercising the like authority.

3d.  Where it grants an authority to the Union, to which a similar authority in the states is absolutely and totally contradictory and repugnant.  See Weaver *v.* Fegley & Brother, 5 Casey 29.

Our citizens undoubtedly have a *status* as state militia, and in this character the general government has no power to govern them.    In that character they are entirely under the state jurisdiction.

I.  The power of the Union to " raise and support armies," is a

distinct grant of power from that relating to the power to " provide for calling forth the militia to execute the laws of the Union, suppress insurrection," &c.

The former relates to what we call the regular army; the latter to the militia. And these forces have always been separate and distinct in this country. Congress may prescribe rules for organizing and disciplining the militia, but the state governs them until called into the actual service of the Union; and then the state appoints the officers, and that has been the practice during the present war. The great body of the forces used in fighting the rebellion were the militia, called into service " to execute the laws of the Union," and " suppress insurrection :" Federalist, p. 131, and Nos. 24, 25.

The Constitution of the United States provides " that the President shall be commander-in-chief of the army and navy of the United States, and of the militia of the several states, when called into the actual service of the United States." And this clause furnishes another argument for the position that the militiaman is not under the the governing control of the United States until he is mustered into " the actual service."

The first section of the Act of July 17th 1862 authorizes the President to call out the militia of the states into the United States service, and it provides that if, by reason of defects in the state laws, or the execution of them, it shall be found necessary, for the enrolling of the militia, the President may make such rule in regard to the same as he may think proper.

By this section authority is conferred on the President to cause the enrolment, when there shall exist defects in the state laws or in their execution. Congress, by this section, clearly contemplated the friendly co-operation of the states, and .clearly recognised the state enactments as valid. By the third section, a bounty is given to volunteers, but there is to be no pay until the volunteer is mustered into the service of the United States, so that the relation of the United States with the volunteer does not commence until he is mustered into the United States service, and his relation to the state, as one of her militia, continues until the moment of mustering in.

Upon the point that this legislation was to aid a class of men, and tax others to aid them in the discharge of a duty imposed by the United States, it is proper to understand that all citizens of every age are liable to military duty, and because Congress had only called for men of certain ages, it does not follow that Congress may not call the whole male population into the field. The duty to be performed is the true test by which to determine the right of taxation for its compensation. The soldier does not go to the field for his own individual benefit. It is not long since it was strenuously argued that it was unconstitutional

for the United States to draft men; that volunteering was the only mode contemplated by the framers of the Constitution.

II. In order to a correct interpretation of laws, we are to look into the old law, the mischief, and the remedy. We shall have little trouble in applying the rule in the present case.

The mischief that gave rise to the seventh section of the eleventh article of the Constitution, was legislation authorizing counties to contract debts, borrow money, &c., for building railroads.

The real question now, is whether the legislature may authorize taxes to be levied to pay military bounties. The fact that a loan of money is authorized, in anticipation of the receipt of taxes, is not material. It was not the design of the amendment to the state constitution so to bind the legislature that taxes could not be imposed for the support and defence of the government, and the preservation of its very existence. The national government had imposed a national tax upon the borough of Blairsville. Taxes may be in money, kind, or services. This was a tax for services; a tax falling upon the whole community. It was not a tax or burden upon individuals, for no one was named; nor could it be known upon whom the draft might fall, if the borough failed to fill its quota. The entire community were deeply interested in the services to be performed. For taxes, the government gives security to life, liberty, and property. Prohibiting the loaning of credit to a "party" never contemplated that the legislature and local communities were fettered in the discharge of those great and paramount duties that every people owe to their government in time of war. Our government may, in its necessity, call for our lives and all our property, and we owe both to our country. And shall it be said that a people may not voluntarily tax themselves for a tithe of this property, in time of war, to support their government? Had the draft taken place, and some, after being drafted had been excused, others had not reported, the community would have been compelled to make good all deficiencies, and the draft would have proceeded until the last man was taken, unless sooner satisfied. How can it be said, then, that the money was raised for a "party?" The money was raised for the sole and exclusive benefit of the borough of Blairsville, to aid in the discharge of a great public duty, that the laws of the land imposed upon every citizen, without regard to age or condition.

*F. Carroll Brewster*, for the city of Philadelphia, argued: Whilst millions have been poured out like water; whilst serving men and women have literally flocked to place their offerings of money upon the altar of their country, to the amount of millions a day, thirty-five appellants come into court complainants against a loan of $5000, incurred by their entire borough for the defence of the nation. If these parties composed the entire borough, their

burden would be only $142.85 apiece. They have come as appellants in equity. They must first and principally establish that they are entitled to come into a court of equity; secondly, that the thing they asked is equitable.

How are the complainants entitled to come into court? The law complained of was enacted March 25th 1864. The town council acted speedily. They authorized the county commissioners to levy the tax March 28th 1864. The commissioners refused to do this, and referred the question to the boroughs on the same day. The bonds were then issued and negotiated, but this bill was not filed until August 11th 1864. Should the court declare these bounty laws void, what is to become of the innocent holders of the bonds? What fate awaits the holders of the thirty millions issued in other counties, cities, and boroughs, upon the faith of similar laws?

No debt has been ever more fairly contracted or more solemnly entered into. The people of the Commonwealth have authorized it in every mode imaginable. By counties—by cities—by townships—by boroughs—by school districts—by conventions of citizens called for the very purpose of imposing it. They have issued bonds for it; they have issued certificates of indebtedness; they have borrowed and used money in its creation; they have authorized the levy of taxes to pay it. The consideration for this debt, too, has been given; the duty contracted for in its creation has been fully performed; and nothing remains but the discharge of its obligations by the contracting parties, who have enjoyed the full consideration. Of the large amount due in Pennsylvania, the city of Philadelphia owes about one-third. This sum she has actually received from her citizens, and she feels that it would be a lasting reproach to her credit if these obligations should be repudiated.

Who raises this question? No department of the United States. How is the government benefited by declaring this act unconstitutional? The appellants argue that " Congress shall have power to raise and support armies." And the argument built upon that was that Congress alone can raise and support armies; and, further, that to assist her purpose is unconstitutional. They rested the objection rather on the refinement in advance of all past rulings, that wherever Congress can legislate, and does legislate, the states cannot even assist its action. This argument, if carried to the extreme, would nullify all laws allowing to the United States the use of our state jails, and many other acts, the validity of which has never been doubted.

Writers on the subject of constitutional law have adopted certain canons of construction as our guides here:

1st. Where the states have ceded an exclusive authority to Congress, the legislatures of the states are powerless to act.

The second general exception to the sovereignty of the state legislature, is where there is a power granted to Congress, and it was exercised, and from its very nature it excludes state action.

There is still another exception to the authority of the states, and that is where they are actually prohibited, as in case of impairing the obligation of contracts.

In all of these exceptional cases the state legislatures cannot act; in all others it is believed their power cannot be disputed under the Constitution of the United States.

The constitution tells us that a state can "engage in war" when " actually invaded," or in such " imminent danger as will not admit of delay."

Beyond this, in times of peace, we enact militia laws, and thus raise armies; and in times of war we enact pension laws, and thus encourage enlistments.

We have a law establishing a state guard. Congress can tax; we tax also. Congress can enact bankrupt laws; we pass insolvent laws. Congress can regulate weights and measures; we do so also. Congress can borrow money; we certainly do that.

The right of the people to keep and bear arms shall not be infringed.

There is no prohibition upon the states as to raising armies for their own use, while the fostering of a military spirit among the people, and the encouragement of the school for the soldier, is made the subject of especial provision and regard.

The Federal Government often relies exclusively upon the volunteers of the states, and the national armies should be made up of the people themselves.

The state and local authorities stand between the Federal Government and the people, who are the source of all power, and out of whose individual persons soldiers are to be made.

In the war of 1812 the states raised, trained, and punished soldiers; our Pennsylvania statute of 1814 did all these things, and yet its constitutionality was expressly affirmed by the Supreme Court. If we did not violate the Constitution of the United States when we actually raised and punished soldiers, how can it be safely argued that we transgressed our authority when we simply offered a bounty to a soldier? See Houston *v.* Moore, 5 Wheat. 1; 4 Curtis 535.

It is said, " The law provides a way of escape, and annuls the Act of Congress." The answer is plain, the law neither annuls nor attempts to annul the Act of Congress.

The appellants insist that the Act of Assembly authorizing these bounties is in violation of the following amendment of 1857 to our state constitution.

" Sect. 7. The legislature shall not authorize any county, city, borough, township, or incorporated district, by virtue of a vote of

its citizens, or otherwise, to become a stockholder in any company, association, or corporation; or to obtain money for, or to loan its credit to, any corporation, association, institution, or party."

This is a question of interpretation, and the rules which obtain in cases arising upon our state constitutions are much more liberal than those relating to the Federal charter.

" The first and fundamental rule is, to construe them according to the sense of the terms and the intention of the parties:" 1 Story on the Const. 283; Vattel, B. 2, ch. 17, p. 262, *et seq.*; Bacon's Abr. tit. *Stat.* I.; 1 Story on Const. 284.

It is well known that the evils pointed out by our Supreme Court in the leading case of Sharpless *v.* The Mayor, 9 Harris 147, as necessary to be remedied only by constitutional law, led to the amendment of 1857.

The money raised by bounty laws was not obtained for a " corporation, association, institution, or party." Because it is paid to the soldier, it does not follow that it was " obtained for a party." Such a construction of the clause would defeat all loans, for all money borrowed was paid to some person.

This money is raised to buy no stock, nor for any use save that of the borrowers; they expended it for their preservation, to repel invasion, to suppress insurrection, to save their towns from the torch which destroyed Chambersburg, to protect their property from the guerrilla; and for the higher, because the holier, purpose of preserving their liberties and the Union.

The opinion of the court was delivered, June 19th 1865, by

AGNEW, J.—Perhaps it would be quite as just to say of this case, as Chief Justice Black said of Sharpless *v.* The Mayor of Philadelphia, 9 Harris 158, " This is beyond comparison the most important cause that has ever been in this court since the formation of the government." The millions of money at stake are greater, and the purpose of their expenditure even more important. That related to subscriptions for mere public convenience—this concerns the lives and welfare of our citizens.

That much of this money has been squandered we must deplore, and that the laws themselves were loosely penned denotes a want of legislative wisdom. They were therefore proper subjects of an executive message to the legislature. " But (as remarked by the same judge) all these considerations are entitled to no consideration here. We are to deal with this strictly as a judicial question. However clear our convictions may be, that the system is pernicious and dangerous, we cannot put it down by usurping authority which does not belong to us. That would be to commit a greater wrong than any which we could possibly repair by it:" 9 Harris 159.

The presumption is always in favour of the constitutionality of

a law; but the request by the concluding counsel, made slightly imperative by its emphasis, that *we* should furnish satisfactory reasons for the constitutionality of the law, seemed to invoke a contrary presumption. But in Erie and N. E. Railroad Company *v.* Casey, 2 Casey 300, the same learned judge states the rule thus: "The party who wishes us to pronounce a law unconstitutional takes upon himself the burthen of proving beyond all doubt that it is so." We have not only the authority of Marshall, C. J., in Fletcher *v.* Peck, 6 Cranch 87, but that of the distinguished judge just referred to for saying, "There is another rule which must govern us in cases like this, namely, that we can declare an Act of Assembly void only when it violates the constitution *clearly*, *palpably*, *plainly*, and in such manner as to leave *no doubt* or hesitation in our minds:" 9 Harris 164.

The question before us relates to certain provisions of the Act of 25th March 1864, for the payment of bounties to volunteers: P. L. 88. It is proper to notice the precise portion to be brought within the scope of our decision, as no opinion should be ventured beyond it. The plaintiff's bill avers that the defendants are about to contract for and to borrow $5000 in the name and on behalf of the borough of Blairsville, to procure volunteer enlistments by paying to each volunteer a bounty of $300, to fill the quota assigned to the said borough by the last requisition of the president calling for six hundred thousand men, to enter the military service of the United States, and thus to avoid the draft ordered to take place on the 5th of September 1864, and to make payment therefor by the issue of the bonds of the said borough. The plaintiffs suggest their interest as tax-payers, that the debt of the borough will be greatly increased by the loan, and their taxes largely augmented. The only question before us is, therefore, upon the power of the legislature to authorize the municipality of Blairsville to borrow money and levy taxes for its payment, for the purpose of paying bounties to those who would volunteer to perform the military service due from the citizens of that municipality under an impending but as yet unexecuted draft.

The bill was filed on the 11th of August, and the draft was not to take effect until the 5th of the following September. The case, therefore, involves no assumption of past debts, or payments to persons already in service, but presents the single question of the power to borrow money and levy taxes to pay volunteers to avoid the injury of a public indiscriminate draft.

Beyond all doubt it is competent for the legislature to confer upon counties, townships, cities, and boroughs the power to borrow money, issue bonds as the evidence of the debt, and levy taxes to pay the same. These are ordinary municipal powers of daily use, and when conferred the only test of their validity is, that the object must be public in its nature. Before the amend-

[Speer *v.* School Directors, &c., of Blairsville.]

ment of the Constitution in 1857 this power was unlimited. Its limitation I shall notice hereafter. Nor is it doubtful in the least degree that this limitation is not a general prohibition to borrow money and levy taxes to pay the same. It would be a startling fact if the people were now to learn from us that a bridge or poorhouse, or a jail or court-house, cannot be built until the taxes have been first laid and collected to pay for it.

The power to create a public debt and liquidate it by taxation is too clear for dispute. The question is therefore narrowed to a single point: is the purpose, in this instance, a public one? Does it concern the common welfare and interest of the municipality? Let us see. Civil war was raging, and Congress provided in the second section of the Act of 24th February 1864, that the quota of troops of each ward of a city, town, township, precinct, &c., should be as nearly as possible in proportion to the number of men resident therein liable to render military service. Section 3 provided that all volunteers who may enlist after a draft shall be ordered, shall be deducted from the number ordered to be drafted in such ward, town, &c. Volunteers are therefore, by law, to be accepted in relief of the municipality from a compulsory service to be determined by lot or chance. Does this relief involve the public welfare or interest? The answer rises spontaneously in the breast of every one in a community liable to the military burthen. It is given not by the voice of him alone who owes the service, but swells into a chorus from his whole family, relatives, and friends. Military service is the highest duty and burthen the citizen is called to obey or to bear. It involves life, limb, and health, and is therefore a greater " burthen" than the taxation of property. The loss or the injury is not confined to the individual himself, but extends to all the relations he sustains. It embraces those bound to him in the ties of consanguinity, friendship, and interest; to the community, which must furnish support to his family, if he cannot; and which loses in him a member whose labour, industry, and property contribute to its wealth and its resources; who assists to bear its burdens, and whose knowledge, skill, and public spirit contribute to the general good. Clearly the loss of that part of the population upon whom the greatest number depend, and who contribute most to the public welfare by their industry, skill, property, and good conduct, is a common loss, and therefore a general injury. These are alike subject to the draft. The blind and relentless lot respects no age, condition, or rank in life. It is therefore clearly the interest of the community that those should serve who are willing, whose loss will sever the fewest ties, and produce the least injury.

The bounty is not a private transaction in which the individual alone is benefited. It benefits the public by inducing and enabling those to go who feel they can best be spared. It is not voluntary

[Speer *v.* School Directors, &c., of Blairsville.]

in those who pay it. The community is subject to the draft, and it is paid to relieve it from a burthen of war. It is not a mere gift or reward, but a consideration for service. It is, therefore, not a confiscation of one man's property for another's use, but it is a contribution from the public treasury for a general good. In short, it is simply taxation to relieve the municipality from the stern demands of war, and avert a public injury in the loss of those who contribute most to the public welfare. This is the design of the law, and it is no answer to say that bad men have abused it. The argument which rises, in its conception, no higher than the relief of the drafted man, and asserts that our money should not be taken to pay his debt, if not already answered by the magnitude of the public interest involved, has its reply in the fact that our question presents no such case. In our case it is yet a matter of public concern, the die has not been thrown, the draft is yet impending, and no one knows who will be torn from the community. The case so stood when this bill was filed.

It is not the individual payment which tests the public character of the appropriation. Individuals are always the recipients of public funds. It is paid to salaries, to pensions, to bounties, for the scalps of panthers, wolves, foxes, crows, and blackbirds, to the poor, to the education of the young, as rewards for the apprehension of horse thieves and felons, to the families of soldiers in service, to aid hospitals, colleges, agricultural societies, and to other useful objects. In all these the recipient is directly benefited, while the public interest in many, is not half so imperious or acute as the relief of a community from an impending draft. The pursuit of happiness is our acknowledged fundamental right, and that, therefore, which makes a whole community unhappy, is certainly a social evil to be avoided if it can be. The support of the poor affords one among the best illustrations of what is a municipal or public appropriation of money. The pauper is the party directly and solely benefited, while his pauperism is a public evil, and often is the result of crime. The pauper has not the merit of the volunteer, while the community is injured, not benefited, by his support. There is nothing but a naked public duty performed in his relief. The same may be said of all expenditures of public money in the punishment of crime.

There is also an illustration to be drawn from those cases (and they are numerous) sustaining the constitutional authority to impose unequal burthens, such as the opening, paving, and grading of streets, the building of sewers, &c., where the owners of adjoining lots are compelled to bear the expenses: McMasters *v.* Commonwealth, 2 Watts 292 ; Fenelon's Petition, 7 Barr 175 ; Kirby *v.* Shaw, 7 Harris 258 ; Schenly *v.* City of Allegheny, 1 Casey 130. Kirby *v.* Shaw was peculiar, sustaining an act imposing a special tax of $500 annually for nine years, upon the borough of

[Speer *v.* School Directors, &c., of Blairsville.]

Towanda, for the building of a court-house and jail. In delivering the opinion, Gibson, C. J., said: " But it is a postulate of the state constitution, which distinguishes it from the Federal, that all the power of the people is delegated by it, except such parts of it as are specifically reserved; and the whole of it is, without exception, vested in the constitutional dispensers of the people's money. As regards taxation there is no limitation of it.  Equality of contribution is not enjoined by the bill of rights, and probably because it was known to be impracticable."  " If equality were practicable, in what branch of the government would power to enforce it reside ?—not in the judiciary, unless it were competent to set aside a law free from collision with the constitution, because it seemed to be unjust."

In Schenly and Wife *v.* The City of Allegheny, the question arose upon a law to levy a special tax on the owners of lots proportioned to the number of feet fronting on the street, to pay for grading and paving.  The opinion delivered by the present chief justice sustained its constitutionality in forcible terms.  After citing the cases I have referred to, he says: " From the principles recognised in these cases it must be apparent that the exercise of the taxing power by the legislature must become wanton and unjust—be so grossly perverted as to lose the character of a legislative function, before the judiciary will feel themselves entitled to interpose on constitutional grounds.  To arrest the legislation of a free people, especially in reference to burthens self-imposed for the common good, is to restrain the popular sovereignty, and should have clear warrant in the letter of the fundamental law."

The extent of the taxing power entered largely into the discussions in Sharpless *v.* The Mayor of Philadelphia.  Black, C. J., said: " I use the language of Marshall, C. J. (4 Wheat. 316), when I say that it may be exercised to any extent to which the government may choose to carry it, and that no limit has been assigned to it, because the exigency of the government cannot be limited."  And again: " I am of opinion that a tax law must be considered valid unless it be for a purpose in which the community taxed has *palpably* no interest ; when it is *apparent* that the burden is imposed for the benefit of others, and where it would be so pronounced *at the first blush.*"  In the same case, after stating the high grounds required to justify the judiciary in declaring a law unconstitutional, the present chief justice said with his usual emphasis : " But on lower ground than this, and especially on ground so low as the *equivocal and undefined purposes of municipal corporations,* Acts of Assembly have never been declared unconstitutional."

These strictly legal views have even been embodied into a sentiment by the late Chief Justice Lowrie, in a case of municipal subscriptions.  His language deserves translation into this case :

14 Wr.—11

"When people," says he, "shall have discovered the exact boundary between engagements that are peculiarly social, and those which are peculiarly individual, then possibly they may be morally entitled to declare that they and their governor and legislature and judiciary have violated their constitution in making such contracts. But even then they cannot honestly retrace their steps without making restitution to those whom they have misled:" Commonwealth *ex rel.* Thomas *v.* Commissioners of Allegheny, 8 Casey 238.

Municipal subscriptions to corporation stocks are no longer authorized ; but Sharpless *v.* The Mayor of Philadelphia, and cases following in its wake, continue to be authoritative expositions of the nature and extent of the taxing power, and the scope of its purposes. It was there held that taxation is not an infringement of the rights of property, is not a taking within the constitutional prohibition, nor such an injury as can invoke the constitutional right to judicial remedy.

If then it be within the scope of a municipal purpose to grant pensions, pay bounties, give rewards for the destruction of noxious animals, and the arrest of felons, employ watchmen, support paupers, build alms-houses, bridges, and markets, aid charitable institutions, make roads, and grade and pave streets at private expense, how much more is that a public affair which has for its object to prevent the forcible and blind extradition of a valuable part of the population into a service dangerous to the lives and limbs of those who go, and destructive of the welfare and happiness of those who remain ! Nor can the dilemma be avoided. It is imposed by the exigency of war and the duty of public defence.

The purpose being clearly municipal, because of its public nature, and therefore within the authority to tax, the power to borrow money in anticipation of the levy is ancillary, following as of course unless within the amendment to the Constitution of 1857. This then is the next question. The amendment provides that "The legislature shall not authorize any county, city, borough, township, or incorporated · district, by virtue of a vote of its citizens, or otherwise, to become a stockholder in any company, association, or corporation ; or to obtain money for, or to loan its credit to any corporation, association, institution, or party." Granting, for the purpose of the argument, that *party* here means person or individual, the only part of the amendment to be considered is the clause," "*or to obtain money for any party.*" We have before us no subscription to stock or mere loan of credit.

The prohibition of the clause is clearly not against obtaining money for individuals in the sense of those appropriations which involve the public interest ; otherwise this would overthrow the whole power to borrow money to perform ordinary municipal functions. It certainly does not prohibit the obtaining of money to pay

contractors for bridges, paving, market-houses, &c., or to pay labourers, artisans, or material-men engaged upon a public work. In every such case where money is borrowed to pay individuals, it is in a broad sense obtaining money for a party. But the sense of the amendment is evidently a restricted one. Its leading thought is the *loan* of the public money or credit to private parties corporated or unincorporated. It is not *payment* in its proper sense which is prohibited, but the private use or control of the public funds. Payment implies a previous debt or consideration, but here advances or loans, which import no obligation or consideration, are the objects of prohibition. There is not a word in the amendment which interdicts the *borrowing* of money merely, or the pledging of the public credit for a municipal purpose, to be laid out by authorized public officers or agents. The purpose was to prevent the money of the people from passing into the control of private irresponsible associations or parties, and from being squandered in undertakings of doubtful propriety, or being liable to be lost through the want of integrity of those engaged in its disbursement. It intended to confine the municipal expenditures not only to public objects, but to public officers or agents under their direct responsibility to the municipality. This is seen in the whole section. Therefore the municipality shall not become a stockholder in a corporation or association, for this would be to make it a corporator or partner in the company, and place its funds under the control of its associates. Nor shall it obtain money *for* these private parties. If I obtain money *for* another, I do not mean that I am paying him my own debt. Then I should obtain the money for myself, not for him. If I borrow to pay what I am bound to pay, I borrow for myself. But the expression "obtain money for" is immediately followed and explained by its adjunct, "*or* to *loan* its credit to," both being linked together in the same sentence before the object or party, common to both expressions, is reached. The history of the amendment also informs us that subscriptions to stock, and lending the credit of the municipalities to private corporations and associations, were the evils to be remedied. But individuals are always in some capacity the recipients of the public money. It makes no difference, therefore, whether a party paid is a volunteer or a witness, viewer, juror, labourer, pauper, or pensioner. The true question is, whether the money is borrowed for a public purpose, and paid *bonâ fide* to a proper person for this purpose, or whether it is money obtained as a loan or advance to the use in all respects of private parties.

In the case before us the object is not to obtain money *for* the *volunteer*, but for the community, which is to be relieved *by* the volunteer. In proper contemplation, the obtaining of the money precedes any knowledge of the volunteer, who only becomes known

[Speer *v.* School Directors, &c., of Blairsville.]

as he steps forward to close with the public offer, and accept the proffered bounty, as the consideration of his service.   The consideration given on his side is most valuable ; he enlists into a dangerous service, running the risk of life and limb ; and take upon himself the burthen resting upon the whole community subject to the lot. The public welfare, as I have already shown, is most intimately involved in the draft ; which enters directly within the field of municipal affairs.   The die is not cast, and the lot is yet uncertain. All are liable within the ages of the greatest capability for usefulness.   The chosen may be the most valuable, useful, and needed members of society, whose extradition may produce the greatest injury and the most distress.   The public interest is more involved in the ills of a draft, than in many evils recognised as public in their nature.   An obstruction to a highway, and a disorderly house, perhaps hurtful to but few, are punished as public nuisances.   Even sounds and smells claim public attention.   An impending draft is an evil certainly more to be dreaded than the odour of a pig-sty, or the clatter of horns.   Can it be that citizens may be torn-from the community, and social ties ruptured, to drag them into a dangerous public service, and yet community cannot interfere to save them on the ground that it is only a private affair ?   Their property may be protected from the storage of powder, by municipal regulations ; but their bodies cannot be saved from being made food for powder in the public defence.   It is possible to hold the disc of the dollar so closely to our eyes, it excludes from sight every object of public interest, and blinds us to every sentiment of humanity.   I hold, therefore, that money paid to save a community from a draft is not obtained for a party or individual, but is a direct appropriation to a public purpose, and that raising money by the ordinary powers of borrowing and taxation for a common purpose affecting the interests, happiness, and welfare of a community, is not obtaining money or loaning credit to any party, within the terms of the amendment.

But if this case fall within the letter of the clause, it is within the spirit and demands of all the exceptions, in the amendments of 1857, when taken together as a whole.   The first section limits the state debt to $750,000 ; yet the second gives unlimited power to contract debts, to repel invasion, suppress insurrection, and defend the state in war.   Two invasions of our state, and the character of the war, attest the necessity of this provision.   But it is said that protection against invasion and insurrection is a Federal duty.   True, it is so by an express grant of power.   But, by the same constitution, every right not delegated is reserved to the states or people ; and I find no clause in the constitution by which the right of self-protection is taken away from the states, in all respects.   On the contrary, I find that in time of war, or when actually invaded, or in imminent danger not admitting of delay,

[Speer *v.* School Directors, &c., of Blairsville.]

the right of the state to keep troops or ships of war is reserved by express exception. The kind of war is not defined, foreign or civil; nor is the duty or mode of self-protection prescribed or limited. To say, therefore, in the face of a civil war raging from Pennsylvania to the Gulf, and of invasions far within her borders, bringing ruin on thousands of her citizens, who are now knocking at the doors of the legislature for public compensation, that there is no power in the state to preserve her territory from irruption, and the lives and property of her people, is to outrage the first law of nature and of government, and to bring unmerited reproach upon the wisdom of the founders of our institutions. Why shall not the state offer inducements to her citizens to go into the Federal service to assist in preserving us from the ravages of war? What clause of Federal or State Constitution forbids it?

By the sixth section of the amendments, the Commonwealth is forbidden to assume the debt, or any part of it, of any county, city, borough, or township; but the exception immediately follows : unless such debt shall have been contracted to enable the state to repel invasion, suppress domestic insurrection, or defend itself in time of war. Now, the exception here implies two things : first, that a municipality may be authorized to contract a debt for defence in time of war or of invasion; and next, that such a debt may be assumed by the state. If we suppose a literal difference in the fact that the volunteer goes directly into the service of the United States, yet the motive is state defence; and the means .thus employed not only actually contribute to this purpose, but experience has shown to be most effective to the desired end. In such a war as this has been, wherein is the difference between the strong Federal arm, outstretched for our protection under the injunction of the Federal Constitution, and the feebler hands of the state militia, that we should declare authoritatively that the former cannot be aided by the state while the latter only can be used? Who has forgotten the mighty shock of arms at Gettysburg, when the whole power of the nation was held in doubtful conflict by a giant and determined foe; and when, for three anxious days, prayers ascended to the God of battles, and loyal men held their breaths, uncertain upon which side the victory had settled? It therefore becomes us well to pause before we stand on such narrow ground. Rather should we become humble pupils in that great school of experience which has taught us how near we were to total defeat. In view of these grave realities of war, and of the necessities of defence, how can it be supposed that a free and intelligent people, in avoiding the evils of municipal subscriptions, ran so far into the opposite extreme that they have stripped themselves of the power of incurring a debt in defence of their lives and property at a time of great public exigency? On the contrary, every line and clause of the exceptions bristle,

as it were with steel, against this artificial, feeble, and unfriendly interpretation.

If we refer to the Federal Constitution we find the war powers wholly conferred upon the Federal Government, including the duty of protection to the states; while the states are prohibited from " engaging in war unless when actually invaded, or in such imminent danger as will not admit of delay." In returning to the state constitution we discover that the exception in the sixth section of the amendment does not stop with a debt contracted to enable the state to repel invasion and suppress domestic insurrection, but includes also debts contracted to enable the state *to defend itself in time of war.* Clearly this is not mere tautology, and something was meant by defence in time of war beyond invasion, or imminent danger of it. Then how defend itself? What provision in the constitution confines state defence to calling out the militia merely? What is there to forbid the encouragement of, or procuring volunteers to enter into the Federal service, when it is manifest it directly promotes the defence of the state? In spirit, purpose, and language, therefore, such a debt is clearly within the exception to the amendment.

There is nothing, in my judgment, in the argument founded upon the alleged repugnance of the law to the Federal power to raise and support armies. There is no conflict of jurisdiction, or of power. Admitting to the fullest extent the incompatibility of any state law assuming to regulate or to interfere with the raising and supporting of a Federal army, there is here no interference, no regulation, and no repugnance. Congress purposely refrained from occupying the whole field of power, and expressly provided for the acceptance of volunteers in discharge of the draft. The Act of February 24th 1864, after providing for the distribution of military service by quotas among the municipalities of each state, declared that " all volunteers who may enlist after the draft shall be ordered, and before it shall actually be made, shall be deducted from the number ordered to be drafted in such ward, town, township, precinct, election district, or county." This portion of the field, as to procuring volunteers, was therefore left open to the exercise of any means to induce persons to enlist in relief of the municipality from the pending, but as yet unexecuted draft. That this was intentional is recognised by the terms of the law. The third proviso of the seventh section, which provides for transfers into the naval service, declares that the bounty money received from the *state,* by any mariner or seaman enlisting from that state, shall be deducted from his prize-money. The proviso in the 20th section, authorizing the discharge of minors entering the service without consent of their parents or guardians, expressly requires such persons, their parents or guardians, first to repay to the government and *to the state and local authorities all*

*bounties* and advance pay which may have been paid to them. The Federal law, therefore, does not assume to control or direct the procuring of volunteers. It simply suffers or permits the citizens to come forward voluntarily, and accept the service of the men to be drafted, and contemplates that inducements in the shape of bounties will be held out to volunteers by the states and municipalities from which they come.

The argument, therefore, that the act of the legislature providing for the payment of bounties to *volunteers*, comes into conflict with the Federal law for drafting men into the service, has not a single foot to stand upon. There is not a single point of conflict. The state bounty operates only upon the will of the citizen to induce him to volunteer, and ends with his acceptance into service. It does not even undertake to determine his fitness to serve, but leaves this to the operation of the Federal law; and this is a decisive answer to the argument that the state bounty throws upon the service unfit persons, while it saves the young and vigorous. If the fact be so, it is an argument to be addressed to Congress to amend its law, or punish the Federal agents. It is a most singular conception that the malpractice of the Federal officials in this respect proves the unconstitutionality of the state law; and if it were not uttered with great gravity by counsel of commanding position, I should suspect it of irony.

In view of the perfect line of demarcation which separates the state and Federal laws in this instance, it is unnecessary to treat the case upon authority. But I may refer to the single case of Weaver *v.* Fegely *et al.*, 5 Casey 27, where the rules governing questions of conflict between Federal and state legislation are stated, and the authorities collected. The rule applied to such a case as this is, that the implication against the power of the state can only arise where the state authority is absolutely and totally contradictory and repugnant.

This opinion was concurred in by STRONG, J., and READ, J., being a majority of the court in banc.

THOMPSON, J., filed the following opinion, in which WOODWARD, C. J., concurred.

The chief, if not the only object of written constitutions, is to limit the powers of government, whether they are to be exercised by the few or the many, and it is only by such means that the people can be assured against the encroachments of power. " Eternal vigilance is the price of liberty," in any form of government, so prone is power to advance beyond, rather than to recede, within its just limits. Resistance and bloodshed designed to rebuke and restrain it, have crimsoned the pages of

history for ages ; but it is to modern civilization the boast belongs of a remedy, in the limitations of constitutions and charters. But these, to be effectual, must be enforced. Neither times nor circumstances should claim exemption from such limitations. The more turbulent the one, or pressing the other, the more need there is of adhering to them. When peace reigns, an enlightened people need to realize but little the fact of government. The time when it is the most to be valued and venerated, is, when commotion, excitement, peril, and war exist. Then all need its protection, and none are safe unless its orders are observed.

We have, I am happy to say, emerged from such a condition, and if we have passed through the ordeal, with even but little to condemn as infractions of the constitutions of our country, we may rejoice. If, on the contrary, their safeguards have been weakened or overthrown, it should be known, and the injury repaired as speedily as possible.

The political division of the sovereign power of the Commonwealth, into legislative, executive, and judicial, had for its object the same end which the constitution itself had, namely, the limitation of power ; and it was supposed to be of value to the security of the principles of the constitution itself, and no doubt it is ; but, notwithstanding the legislative power is conferred on a Senate and House of Representatives, with a limited control on part of the executive, it often happens that all these are mistaken in the fact of the constitutionality of enactments ; so indeed may the judiciary be, but beyond their action there is no legal appeal ; it is necessarily final.

Whether an act be constitutional or not is a judicial *fact*, to be determined by the application of principles and rules like any other fact, and if by the application of such rules and principles it is found to be violative of the constitution, it has no effect, because it is NOT A LAW. It is paradoxical to say a *law* is unconstitutional. To arrive at a conclusion that an act is not constitutional, is to announce that there is no law on the subject. It is true the current terms descriptive of such a result are, that the law is unconstitutional and void. The people should know that a court neither wills a law to be unconstitutional, nor are they in the least degree to be thought antagonistic to those who pass it, when they pronounce it so. We look at it as we do at the deed by which a man claims an estate, which if invalid we so declare without willing it to be so, or in any spirit of hostility to him for having claimed under it ; he may have done so in entire honesty, but that alone will not make his title good, if for good reasons it is bad. Nor will the best and most patriotic intentions make that a law which contradicts the principles of the constitution or contravenes its prohibitions.

[Speer *v.* School Directors, &c., of Blairsville.]

The elementary principle that governs in judging the constitutionality of an act of the legislature is, that until the contrary appear, it is to be presumed constitutional. This is due to the high official character of the bodies which have sanctioned it. He, therefore, who alleges the invalidity of an act, must establish that fact. In doing this, as it is in denial of the right to legislate in the particular instance, and as in the state constitution, whatever of legislative power is not withheld may be exercised, he must establish his position clearly and conclusively. For a doubt about the power of legislation, in any given instance, is not equivalent to a denial of it. If, therefore, the clear principles of government, as disclosed by the constitution, either expressly or by necessary implication, condemn the act now under consideration, and others of like kind, we cannot, if we would, avoid saying so. Let us therefore proceed, with the utmost care, to see how this is, for it may not be disguised that the question in its consequences is of vast importance to the people of this Commonwealth.

On the 25th of March 1864, when the act referred to in the complainant's bill was passed, there had existed a state of war, between the United States and the so-called government of the " Confederate States of America," for nearly three years. It was war; so treated by all the branches of the government of the United States; in fact by all foreign powers. In consequence thereof, on the 3d of March 1863, an act was passed by Congress, known as the " Conscription Law," by which all able-bodied male citizens of the United States, and foreigners who had declared their intentions to become citizens, between the ages of twenty and forty-five years, were declared to constitute the " national forces" of the country, and made liable to perform military duty as soldiers, when called out by the President for that purpose. The law applied to and operated on every individual of the class, as was held by the majority of this court in the Conscription Cases, 9 Wright 238, and therefore each man was obliged under the penalties due to desertion in times of war, to respond for himself, either by becoming a soldier, furnishing a substitute, or paying $300 commutation. It is an undoubted duty of all to sustain the state against its enemies, those who are able as soldiers in the field, and all others in some systematic form of contribution in money; always in constitutional governments levied by taxation.

Service in the field, at the call of the superior lord, was incident to the feudal tenures; and the same was due from the lords and their feudatories to the king. So the principle, not exactly as incident of tenure, has come to us, and must as a necessity exist in every government.

[Speer *v.* School Directors, &c., of Blairsville.]

The aggregate of individuals in a state compose its forces, and it is only by this aggregation of service due by *each man* capable of bearing arms that an army can be raised.   The service is personal, however called for, either by the state or general government, and of course whatever might be rendered as an equivalent for that service by the individual owing it, must also be personal and individual.   However much any community may be interested in the creation of an army, it is not a matter of public concern that this or that man is liable to be called on to enter it.   The state is bound to sustain him with the means of living while in it, and the modern rule is, to compensate him also for his services. This, however, is of grace on part of the state; yet undoubtedly it is his duty to defend it if required, pay or no pay.   But it would be a startling assumption to claim that the community, or any portion of it, are bound to contribute money to provide a substitute, to enable him to escape the service altogether!   To maintain this would be at once a denial of the obligation, that each individual is, in his own person, bound to defend or aid in defence of the state in some of the modes which the state may prescribe.   It is not easy to elucidate or prove the existence of what is self-evident, and that is the difficulty in the way in demonstrating that the service of an enrolled citizen, if drawn, is personal, or, if only liable to be drawn, the same.   That it is individual and personal I think none can doubt.

It seems to me, if this be so, the authority conferred by Act of the 25th of March 1864, if it be of authority at all, and the validity of which we are now to determine, is plainly an act to authorize a tax for private and individual purposes, and not for a public or general purpose.   Let us briefly analyze a portion of it.

The 6th section provides that the commissioners of the several counties be authorized to borrow such amounts of money as may be sufficient to pay to each non-commissioned officer and soldier, who may thereafter volunteer in the service of the United States from such county, and be credited to the *quota* thereof, in pursuance of a requisition of the President, a bounty of $300 each; and in case the county commissioners shall fail or neglect to do so, then the minor divisions, such as townships, boroughs, wards, and school districts are authorized to exercise the power for themselves. Then, by the 7th section, " the county commissioners or school directors, road commissioners, or supervisors of any township; or the corporate authorities of any city, ward, or borough," are authorized to issue bonds or certificates of indebtedness in the name of such county, township, borough, &c., with or without interest, and payable at such times as the authorities and party lending may agree upon; and to lay and assess a tax or taxes on all property taxable for state and county purposes, to pay the same when due.

[Speer *v.* School Directors, &c., of Blairsville.]

These provisions apply to the procurement of volunteers, but other provisions in the act go a great way beyond this, and require these county and subordinate authorities to borrow money and impose taxes, to comply with all agreements previously made by them without authority; and "to refund advancements made to procure volunteers by any committee, special commissioners, individual, or individuals."

Let it be noticed that not only soldiers to take the place of those that the Act of Congress designates, but that the self-created creditors of the district, become so in order to save themselves from services, are required to be paid their outlays. I do not think it necessary to give a synopsis of all the provisions of the act, and I forbear the attempt, with the expression of my conscientious belief, that from the foundation of the colony of Pennsylvania, or any other of the states, to the day of the passage of this act, no parallel to it can be found in the recklessness of power conferred, to create debts without limit or stint, and to authorize the assessment of taxes to any, even to 100 per cent. of the assessed value of the real and personal property of the people, if so much be required to pay the indebtedness authorized, at the time or times agreed upon. Call it by what name we may, its operation is a surrender of the property of the people to the keeping of the local authorities, elected in view, in most instances, of ordinary local duties, and generally with no reference to qualifications for the exercise of such unlimited powers. In portions of the state it is a matter of public notoriety that 10, 15, 22, and even 36 per cent. on the assessed value of real estate, has, for this year, been levied under this authority, and that of special acts. I submissively ask, if this may be done under our constitutional government, is it any better than a despotism, especially in view of the fact that every particle of the service sought would have been secured without such a resort?

I have endeavoured to show, and I think have succeeded in showing, that any man fit for military duty, enrolled under the Acts of Congress, owes a *personal duty* to the country to the extent which that law requires (it being declared constitutional in the decisions referred to), and that there is no real hardship in requiring him to perform it, because a condition of his membership of society, and reciprocal for a duty on part of government to protect him. This being so, the act in question is not that defenders of the country may be raised up by the fruits of taxation by local authority, but that those enrolled may not be called to fill the local *quota*, and that others may, by means of money raised from the people, be induced to take their places. What is this but taxation for the benefit of those designated to fill the *quota* in any district, be the number one, two, or one hundred?

Each one of the number relieved is released from a *debt he owes* the country, and the community pays for it. Is not money raised for this purpose a private purpose? The enrolled man must go if the wheel of the provost-marshal says so, or find a substitute, or pay a certain sum of money. These alternatives are his, and the public have nothing to do with them. It has no interest in the question of his compensation; the government calling him provides that. If the public can be assessed to raise the means to relieve him from going to the field, or providing a substitute, is this not solely his advantage, and not a benefit, in any sense, to the public? The inquiry to be answered in this case is simply and singly this, Is it within any grant of legislative power, that the legislature may authorize taxation of the people to pay the debt, or discharge the *private* obligation of any individual in the community? I need not argue as to the power of the state over money in its treasury; but can it delegate its power of taxation to a county or township to raise money for a mere private purpose; for one citizen, or a dozen? The service of the soldier, it is true, may secure a great public end, but his service is rendered, when required by the government, as a service owing in his own person, and under an obligation resting on him as a man and a citizen, and not on community. The purpose would be no less a private purpose than would an authority to tax the people to pay militia fines, or fines for non-attendance of jurors, or penalties enforced for the non-performance or violations of any statute law. The duty to perform the service or pay the penalty belongs to the individual and not to the public, although the public alone may be benefited by the service. Bounties and gratuities to soldiers are patriotic and commendable undoubtedly, but it is the duty of the government to pay them, if they be deemed necessary; or private liberality should provide them, but it is not a legitimate purpose of a township, ward, or borough to create debts for any such object. While there may be an implied duty to contribute by taxes to *local* public purposes, and the right to exercise legislative power may possibly be conferred to enable this to be done in some possible cases, yet for *private purposes* no law can compel it, and the authority of this court clearly stands for this.

In Sharpless *v.* The City of Philadelphia, 9 Harris 147, this was not only over and over again said, but it was only by escaping from the conclusion, that the purpose of county subscriptions to railroad corporations was not a private purpose and object, that it was arrived at at all. This was the strain of the case. Nothing that Chief Justice Black uttered on that point was in any way dissented from by those who concurred with him in the judgment; in fact it was the postulate of all their opinions.

He said: "Taxation is a mode of raising money for public

purposes; when it is prostituted to objects in no way connected with the public interest or welfare, it ceases to be taxation and becomes plunder. Transferring money, from the owners of it, into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional for all the reasons which forbid the legislature to usurp any other power not granted to them." Again, "neither has the legislature any constitutional right to create a public debt, or lay a tax, or authorize any municipal corporation to do it for a mere private purpose." * * * "The right to tax depends on the ultimate use, purpose, and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it. A tax for a private purpose is unconstitutional, although it passes through the hands of public officers."

These were weighty and well-considered words, and marked a distinction which, had it been regarded, even if there had been no other protection against the legislation contained in the Act of 25th March 1865, would have saved the people of the state not less than forty millions of dollars, in addition to the legitimate expenses of the war which they ought cheerfully to pay. Corruption and bounty brokerage would have fared less sumptuously it is true, but the military service of the country would have been benefited by all the difference between hirelings gathered up, as was generally the case, to fill *quotas*, without regard to capacity, patriotism, or country, and good sound citizens. I grant that good men often availed themselves of these bounties, but they would have responded to the call of their country without them. The adventurer, bounty-jumper, and broker fattened on the fruits of this grievous mislegislation. The public service was positively injured by it.

It is history now, that the evils resulting from conferring on municipal corporations the power to tax themselves even for public purposes eventuated so oppressively as to move the people, almost with one accord, to amend the constitution, that such a thing might not occur again. Many counties, even to this day, groan beneath the weight of the burthen recklessly imposed by the exercise of these local legislators, empowered to bind them. What must the state of feeling in those regions be when "swarms of officeholders" created by this, and laws of the kind, call for the substance of the people, to pay what has been squandered on persons, and for objects, that neither they nor their posterity may ever discover the benefit of, or authority for? It was a sad expedient, this authority to municipal boards, even if legal. We had Federal authority clothed with ample power to raise the necessary taxes for the war, and to appropriate it to purposes the most

beneficial to the cause of all. This was a clear constitutional right, guarded not only by every legal protection, but to be administered, in the face of the nation, and subject to receive either its approval or condemnation. It seems to me that even the warmest advocate of township, ward, or school-district legislation, will hardly claim for them a much superior opportunity of judging accurately, as to what was best to be done for the " common defence and general welfare," than Congress; and yet nothing but a thorough conviction of this ought to have justified the transfer of such legislation or power to such bodies. I admit that this court has no power to correct unwise legislation; bad it may be, but if only so, we cannot interfere; it is not our business to rebuke it, but it is a significant symptom that it is unauthorized if so oppressive to the people as this legislation must prove. The constitution is the only safeguard in times of danger—to abandon the safeguard is equalled only by the wisdom that would abandon a secure anchorage in a storm, to run the chances of being stranded on a lee-shore.

In Phila. Asso. for the Relief of Disabled Firemen *v.* Wood, 3 Wright 72, this court refused to aid the recovery of money secured by bond to be paid to the association, as a duty or impost authorized by the legislature, in consideration of a license as a foreign insurance agent. It was thought to be repugnant to rightful legislation, to grant a privilege to a company on terms of its paying a duty or impost to a private association of individuals. Lowrie, C. J., said, in delivering the opinion, " a tax is an imposition for the supply of the public treasury, and not for the supply of individuals or private corporations, however benevolent they may be." And I will add, or patriotic, unless it be a public duty. I hold, therefore, without hesitancy, that the act in question which proposes to authorize the corporations named to create debts and assess taxes to pay bounties is void; because the purpose is private and not within any grant of power to the General Assembly; and being so is unconstitutional and not a law. This view is not all. It only regards the misconstruction of the powers conferred by the constitution, but it touches not those denied or prohibited. There is no essential difference, however, in the effect of an adverse conclusion, on either principle. For there is just as little right to exercise powers not granted, as those prohibited. The same word might not characterize both, and that is the only difference.

In 1857 the people of the Commonwealth thought it necessary to establish limitations on the subject of state and local indebtedness, and they very clearly defined those they desired in Art. II. A certain amount of indebtedness was fixed as the limit beyond which the state could not go, excepting to suppress insurrection,

[Speer *v.* School Directors, &c., of Blairsville.]

defend the state in time of war, or redeem the present indebtedness of the state. And she was forbidden in any manner to pledge or loan her credit to " any individual, company, corporation, or association, or to become a joint owner or stockholder in any company, corporation, or association ;" or assume the debt, or any part thereof, of any county, city, borough, or township, or corporation, unless such debt shall have been contracted to enable the state to repel invasion, suppress domestic insurrection, defend itself in times of war, or to assist the state in the discharge of any portion of its indebtedness. So much for the limitations on the legislature in regard to the state. They are clear and plain, and the objects, the security of the people from the dangers of inordinate burthens and taxation, to pay debts contracted under excitement or otherwise, is palpable in every word. The next clause limits the authority of the legislature equally explicitly in regard to the municipal divisions of the state. It is as follows : " The legislature shall not authorize any county, city, borough, or township, or unincorporated district, by virtue of a vote of its citizens, or otherwise, to become a stockholder in any company, association, or corporation, or to obtain money for, or loan its credit to, any corporation, association, institution, or party."

The inquiry by one of the counsel for complainant, " can there be a doubt that the amendment was intended to cover everything outside of the legal and legitimate current expenses for the lawful administration of the government of the county, borough, or township," has not been, and cannot be, satisfactorily answered negatively. State, county, borough, city, and township had grievously sinned in the creation of debts under the constitution. To restrain this disposition, in all time to come, was the object of the people in this legislation. This is the plain, obvious meaning of these provisions, and this is just the rule by which constitutional provisions are to be interpreted : 9 W. & S. 127 ; 5 Wright 454. The enumerated classes to which the prohibition extends, cover by all fair interpretation every artificial or natural person or thing that can use money. Government, church, state, society, corporation, association, institution, person or persons, are all included in the terms used. If technicality may find any way of escape from the generality of the prohibition, I am not ingenious enough to discover how. But we are not allowed the use of such a process to sap and mine the buttresses of the constitution. It is the legislation of the people we are to deal with, and it is to be read and obeyed in the plain meaning of the words they have chosen to use. This is the judicial rule also, and must be observed. Now, it matters not, in this view of the subject, whether the bounties to be paid by money to be borrowed, by counties, townships, &c., are in aid of the United States, the state, individuals liable to be

drafted, or those who have advanced money to encourage volunteering, or to comply with contracts made with volunteers. All these are either corporations, associations, or parties. A government is a corporation aggregate. It never dies, and it is this that gives it immortality. All its people die in succession, but still it lives; the king is a corporation sole: 1 Black. Com. 458–9; and so is a bishop. Government is also an institution; and if it should ever enter the brain of any school district authority, or supervisor of a township, to lend the credit of his department to the United States, here is, fortunately, authority to prevent it. It would be, however, to impute an extreme of folly and absurdity to the legislature, far beyond that which might lead to constitutional mistakes, to suppose that the authority to raise bounties was given to aid the government of the United States, already armed with the amplest power, as was said by a majority of this court in the Conscription Cases, 9 Wright, to compel each individual man to enter the military service on its own terms. But even if the folly could be imputed, which decency forbids, the legislature never had the right to grant the power for any such purpose. It was not granted to them to authorize such "entangling alliances."

The authority given to these corporations is to borrow money, to repay advancements by individuals and committees, and to relieve enrolled citizens from the draft. These purposes may not be included in the prohibition to borrow money for any corporation, association, or institution. This is admitted; but it is demonstrably clear "that any party," the aid of which is also prohibited, does include all these. Whom do these words describe, if not persons not embraced in the terms "corporations," "associations," or "institutions"? We have seen that these last are large terms, and they embrace every person except private individuals. As the expression "party" was not used to describe those embraced by the preceding terms, it must have some application, and to what can it have application excepting to the class not embraced by them, which must be unassociated individuals? The other classes being embraced by the preceding terms, we must give effect to this expression. Nobody ever heard of a constitutional provision being discarded as meaning nothing. This, however, must come to pass before we can find constitutional authority for the borrowing and consequent taxation authorized by these bounty laws. The words used mean unassociated or private individuals, or they mean nothing. Such purpose is prohibited.

The third definition of the word "party" by Webster is "one concerned or interested in an affair" (*e. g.*) "he was not a party to the trespass or affray;" "he is not a party to the contract or agreement." We know its ordinary sense is even more extensive

in its application to individuals than this. We say of one, he is a *party* to be trusted, benefited, or a party proper to be employed, or a party to be avoided, and the like. All these expressions apply as well to individuals as to associations, contractors, or litigants. There is no sense, whatever, in which it can be used in this amendment, but to individuals. But even if there be, the prohibition is no less positive. The power given by the act was to encourage volunteering, no matter whether it be a pecuniary benefit to the party volunteering or to the party who escaped the draft. It was authority to pledge the credit of the municipality to borrow money to be redeemed by taxation, for a "*party*," and this the people have said, with what effect this decision will show, should not be done.

Of a constitution, Marshall, C. J., in McCullough *v.* Maryland, 4 Wheat. 397, said, "Its nature, therefore, requires only that its great outlines should be marked, its important objects designated, and the main ingredients which compose those objects must be deduced from the nature of the objects themselves." The words in this amendment mark distinctly enough the outline and object to be attained, and we must absolutely close our eyes to avoid seeing that corporate indebtedness beyond the purposes expressly allowable, created by irresponsible and unfit agents or any agents, and to be followed by onerous taxes, was the thing intended to be guarded against. And it is just in times of public excitement and alarm that such a provision is a protection.

There may be persons constituted to believe that the only object of the constitutional amendment was to prevent a recurrence to municipal subscriptions to railroads or other corporations, and that everything outside of that and within the "omnipotence of parliament" remained as it was. I cannot believe that thus thought the people. It is evident that everything not legitimate to corporate purposes was intended to be forbidden. The words used are broad enough for this. Shall we dwarf their significance to suit the tide of the times? We ought to have no choice but to give them the construction they ordinarily bear and the effect intended; this would effectually prevent corporate indebtedness to aid even the Union in carrying on a war, or any other party, outside of the sphere of legitimate municipal operations. It would inevitably condemn such authority as is given by this act and all other like acts.

There is still another objection to this act, and to which much force in argument was directed at both hearings of this case. In one sense, it arises out of a conflict of authority between national and state legislation; or rather it involves the rights and privileges of the citizens of a state, secured by the Constitution of the United States, the benefit of which they may lawfully claim.

14 Wr.—12

[Speer *v.* School Directors, &c., of Blairsville.]

More distinctly, it is this : Congress has, by express grant, power to declare war, raise and support armies, and *maintain* a navy. It is invested also with express power to pass all laws *proper* and *necessary* to execute these powers. Among these are the right to call for soldiers, and to impose taxes to carry on the operations of the army and meet the general expenses of the war. Both of these powers Congress had exercised before the passage of any of these acts, and the question now is, can the state authorize a taxation of the people for the same object ? I do not doubt the right of a state to raise money and men to defend herself from invasion ; but this must be the real object, and not a pretext. Casuists might argue that the defence of the state is involved in the success of the national arms ; for peradventure in case of failure, invasion might ensue as the result of that failure. But such meaning is inadmissible ; it would justify state armies whenever the necessity for a national army should exist, and thus endanger the defeat of the Federal authority altogether. Whenever a war is waged by authority of Congress, and full power on the subject by the National Government has been exercised, I cannot comprehend the right of a state to interfere, except in case of actual invasion ; and then the interference must be for that purpose primarily, and not secondarily, or as a consequence to flow from want of success against the common enemy. The case of Houston *v.* Moore, determined by this court, and reported in 3 S. & R. 169, and affirmed in the Supreme Court of the United States, 5 Wheat. 1, has been referred to for an opposite doctrine. This is a mistake. The penalty inflicted by the court-martial in that case was under a state law, copied, it is said, from an Act of Congress ; but the action of the court-martial was sustained because the penalty was incurred for disobedience to the orders of the state executive, and before the delinquent had entered the service of the United States at all. The President had made a requisition on the state for a portion of its militia, and, in the process of furnishing it, the offence was committed, and the soldier punished for disobedience to state orders before the Federal authority attached. It was on this ground the case was decided and affirmed in the Supreme Court of the United States. But the opinion of Washington, J., describing a case where Congress has exercised authority, is very direct and in point in support of the position assumed by the counsel for the complainants. " If in a specified case," says the judge, " the people have thought proper to bestow certain powers on Congress as the safest depository of them, and Congress has legislated within the scope of them, the people have reason to complain that the same powers should be exercised at the same time by the state legislatures. To subject them to the operation of two laws upon the same sub-

[Speer *v.* School Directors, &c., of Blairsville.]

ject, dictated by distinct wills, particularly in a case inflicting penalties, is, to my apprehension, something very like oppression. In short, I am altogether incapable of comprehending how two distinct wills can at the same time be exercised in relation to the same subject, and be effectual and at the same time compatible with each other. If they correspond in every respect, then the latter is idle and inoperative; if they differ, they must, in the nature of things, oppose each other, so far as they do differ. If one imposes a certain punishment for a certain offence, the presumption is that this was deemed sufficient under all the circumstances, and the only proper one. If the other legislature impose a different punishment in kind or degree, I am at a loss to conceive how they can both co-exist together."

Nothing could more happily express the true idea of the position than this, and goes far to prove its correctness. If Congress impose a tax which it deems sufficient for the war, the people must obey, because they have ordained that the Constitution of the United States, and Acts of Congress passed under its authority, shall be the supreme law of the land. This is their constitution and their delegation of authority. Must they also obey another supreme law emanating from the state on the same subject? This exercise of the war power was delegated to Congress, and not reserved to the states or people. The people must submit to the authority they have given Congress, but surely ought not to be compelled to submit to a duplicate exaction by the state, much less by every petty municipal authority that the legislature may authorize to try its hand at taxation. Indeed, we have heard an argument of the possibility of a state *navy*, under, it is true, the idea of a defensive necessity. This idea seemed to me wrapped in a sophism, accidental no doubt, which, in its peculiar connection, was made to assert that defence is often best secured by an offensive movement, and as the state is authorized to repel invasion she may anticipate it, and send her *navy* and army abroad to make the assault to prevent the anticipated invasion. This would be good policy on part of a state retaining all its rights and powers over peace and war, but not of a state in the American Union. Such doctrines go far beyond my notion of state rights; but are not at all irrelevant in arguing the point assumed by the defendants.

The harmony of our complex yet simple system of government, is only to be preserved by a strict regard to the operation of its parts, within their assigned limits. A disregard of this will bring, and has brought on, collision between the parts, and will necessarily threaten the evils of discord and perhaps again war. The error in what is contended for on part of the defendants, is in mistaking the right of a state to repel invasion as a war power

[Speer *v.* School Directors, &c., of Blairsville.]

in all its senses. It is so in a limited sense only; beyond that, the government of the United States has charge and jurisdiction of the matter. A state cannot make war to prevent anticipated invasion. This belongs alone to the Federal Government. The power of the state is by both federal and state constitutions confined to repelling invasion when it attempts to cross her borders. This mischievous act and its confreres have resulted from the error, that the Federal Government either possessed less power than it does, or the state more; and the interference by the latter, to put the best possible face on it, is to assist the former to raise an army. The former, unfortunately, however, for the exercise of authority by the latter, had fully exercised all the powers it deemed necessary to the end in view; this left the latter without any right to interfere in any manner whatever. This legislation, therefore, in my opinion, can neither stand on the right to find soldiers in relief of the enrolled citizen, nor in the exercise of a war power by the state, not applicable to the case of invasion. Nothing like this was threatened at the time, and there is not the remotest reference in the act to the necessity of soldiers for any such purpose.

These are my views of this momentous question; a question involving a debt—large enough for a nation—to be borne if such views are not to be held for law, by the people of a state burthened by a heavy state debt, by the extravagance of former municipal subscriptions, and by its full share of an enormous national debt. The people have always discharged their duty faithfully to state creditors, and will do so; but it is grievous indeed, if they are to be ground down by impositions against which they have endeavoured, most faithfully endeavoured, but in vain, to provide a protection. I am in favour of granting this injunction.