Basehore *v.* Hampden Industrial Development Authority.
Walker, Appellant, *v.* Butler County Industrial Development Authority.[1]

[1] The above appeals were consolidated for argument specially on June 27, 1968.

Argued April 24, 1968; reargued June 27, 1968. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

*Richard C. Snelbaker,* for plaintiff (Basehore).

*Paul H. Rhoads,* with him *Walter K. Swartzkopf, Jr.,* and *Rhoads, Sinon and Reader,* for defendant, Ralston Purina Company.

*Tom H. Bietsch,* for defendant, Hampden Industrial Development Authority.

*William C. Sennett,* Attorney General, and *Vincent X. Yakowicz,* Deputy Attorney General, with them *Edward Friedman,* Counsel General, for Commonwealth, intervenor.

*Edward G. Bauer, Jr.,* City Solicitor, with him *James L. J. Pie,* Deputy City Solicitor, and *Matthew W. Bullock, Jr.,* Second Deputy City Solicitor, for City of Philadelphia, intervenor.

*Walter Stein,* with him *Frederick D. Wood,* for Philadelphia Authority for Industrial Development, intervenor.

*Silvio P. Cerchie,* with him *Saul J. Bernstein,* for plaintiff, Walker, appellant.

*Paul G. Perry,* with him *David E. Johnson,* and *Burgwin, Ruffin, Perry, Pohl & Springer,* for defendant, Armco Steel Corporation, appellee.

*Norman D. Jaffee,* for Butler Authority, appellee.

*Charles T. Chew,* for Board of County Commissioners of Butler County, appellee.

OPINION BY MR. JUSTICE JONES, November 22, 1968:

Both these cases originated as equity actions to enjoin the respective defendants (municipal authorities, certain officials and private concerns) from taking any action pursuant to acquisition agreements ("Agreements") entered into by the respective defendants pursuant to the Industrial Development Authority Law (Act of August 23, 1967, P. L. 1609, 73 P.S. §371) ("Act"), and the Amendment to the County Code (Act of January 12, 1968, P. L.    , §1999g, 16 P.S. §1999g) ("Amendment"), authorizing the issuance of

nondebt revenue bonds by counties of the third to eighth class. In effect, these are taxpayers' suits to test the constitutionality of the Industrial Development Authority Law, supra, and the amendment to The County Code and to test the constitutionality and legality of Agreements entered into between the Butler County Industrial Development Authority and Armco Steel Corporation and between the Hampden Industrial Development Authority and Ralston Purina. Company. In both cases, the parties have stipulated the facts. In appeal No. 167, the Court of Common Pleas of Butler County upheld the constitutionality both of the Act and of the Acquisition Agreement and in appeal No. 91, this Court granted special certiorari to the Court of Common Pleas of Cumberland County.

The two Agreements here in question are similar in their provisions.[2] The Hampden Authority was formed pursuant to an ordinance of the Board of Township Commissioners of Hampden Township for the purpose of constructing or acquiring industrial development projects. On January 16, 1968, the Authority and Ralston entered into an Acquisition Agreement under which the Authority agreed to buy the industrial site on which the proposed factory will be built and the site would be leased to Ralston for a term of 30 years and the Authority will provide funds for the construction of the new industrial plant by floating revenue bonds issued by the Authority in the principal amount of $8 million.[3] Ralston agreed to construct the industrial plant with the funds and to lease it

---

[2] We will set forth the terms of the agreement between Hampden Industrial Development Authority (Hampden Authority) and Ralston Purina Company (Ralston). Differences between this Agreement and the Agreement between Butler County Industrial Development Authority (Butler Authority) and Armco Steel Corporation (Armco) will be noted in the footnotes.

[3] The cost of the Armco Steel project will be $26 million.

from the Authority at an annual rent sufficient to pay the interest on and amortization of the principal of all bonds and other obligations incurred by the Authority in setting up the project; if the amount raised by the bonds does not cover the cost of construction, Ralston agreed to complete the project and, in addition, to pay all costs of maintaining and operating the project once it is completed. Moreover, Ralston agreed to pay annually *in lieu of taxes an amount equal to the taxes it would have to pay if the project were not owned by a tax-exempt authority.*

Ralston was the assignee of an option to purchase the site on which the project will be built.[4] On July 13, 1967, Ralston gave notice of its election to exercise the option and paid $12,000 toward the purchase price; no conveyance was made, but Ralston proposes to assign the contract to purchase the site to the Authority. Under the Agreement, Ralston has the right to assign or sublet the project once it is completed, but, if it does so, it will remain primarily liable for the performance of the Agreement.

Ralston has the further right to purchase the project during the term of the lease or after retirement of all debt obligations and, under no circumstances, would Ralston purchase the project without first providing sufficient funds to retire all debt obligations; in addition to paying all expenses of the Authority in winding up the project, Ralston would pay $1000 upon purchase of the project.

The bonds to be issued will be revenue bonds. It will be stated on the bonds that all principal and interest will be payable exclusively from the income, rentals and revenues of the project and that neither the general credit nor the taxing power of the town-

---

[4] The land on which the Armco Steel plant will be located has not been purchased yet.

ship or the Commonwealth is pledged for payment of the bonds. The bonds will state further that they are not obligations of the township or Commonwealth. All bonds will mature before the life of the Authority expires. The bond indenture prohibits foreclosure or execution on any property involved in the project.

The project envisages the construction of a new plant which will employ 100 persons at the outset[5] and will not replace a plant already in existence in Pennsylvania. Under Section 12 of the Act, Ralston will let the construction contracts and purchase machinery without competitive bidding.

The Secretary of Commerce of the Commonwealth approved the project on January 18, 1968, as required by Section 7(f) of the Act.

Industrial development authorities are not new, the first such authority having been set up in Mississippi in 1936. Today over 40 states have established such authorities. The principle behind the projects is relatively simple. Tax-exempt authorities are established to build plants for private manufacturing companies and the funds used to construct the projects come from revenue bonds which are tax-exempt under Section 103(a)(1) of the Internal Revenue Code of 1954.[6] Obviously, the projects are enticing to private manufacturers since the authority can build the plant at a lower cost utilizing tax-exempt revenue bonds than the company could by utilizing its own nontax-exempt bonds. The projects are enticing to the Commonwealth since presumably they will attract industry to the state or encourage industries already located in Pennsylvania to increase their facilities and increase employ-

---

[5] The Armco Steel plant will employ 400 persons.

[6] A new Subsection C dealing specifically with industrial development bonds has recently been added to Section 103. See 1 C.C.H. 1968 Stand. Fed. Tax Rep. §103, ¶942A.

ment. In effect, the federal government subsidizes the construction of plants for private manufacturers to enhance and increase employment.

In most states having such projects, taxpayers have brought suits to test their constitutionality and, in most instances, the courts have held that the projects are constitutional.[7] As in most of these suits, the taxpayers in the present suit have alleged that the Act and the Agreements violate several provisions of the State and National Constitutions. We will deal with their major contentions in turn.

## I.

There is no question that the Authorities are instrumentalities of the Commonwealth, that the projects are owned by the Authorities and that these requirements are essential in order for the revenue bonds to receive a tax-exempt status under Section 103(a)(1) of the Internal Revenue Code. The instant taxpayers claim that the Authorities are using public money for what is essentially a private purpose, i.e., constructing plants for two private manufacturing corporations. The Authorities argue, on the other hand, that the projects are primarily public in nature, that the Act is designed to attract businesses to Pennsylvania or enhance existing businesses and to increase employment, that new plants will create jobs, and that taking steps to create jobs is within the police power of the Commonwealth.

The Act details legislative findings that unemployment is a serious problem in the state and that industrial development projects are effective means to fight

---

[7] The latest count indicates that 26 state Supreme Courts have validated industrial development programs and 10 have invalidated such programs. For a complete list as of 1966, see *City of Gaylord v. Beckett*, 378 Mich. 273, 144 N.W. 2d 460, 469 n. 9 (1966).

unemployment.[8] The taxpayers argue that it is for the courts and not the legislature to evaluate the public purpose of a statute when that statute's constitutionality is attacked. On several occasions, this Court has stated that legislative findings of fact are entitled to a prima facie acceptance of their correctness: "It is to be noted, too, that the Housing Authorities Law declares the purposes of the act to be 'public purposes for which public money may be spent and private property acquired by the exercise of the power of eminent domain,' and, while such a legislative declaration is not conclusive—it being for the ultimate decision of the courts as to whether a proposed use is a public one—it is entitled not only to respect but to a prima facie acceptance of its correctness.": *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 222, 200 Atl. 834 (1938). See also: *McSorley v. Fitzgerald*, 359 Pa. 264, 268, 59 A. 2d 142 (1948); *Belovsky v. Redevelopment Authority of Philadelphia*, 357 Pa. 329, 334, 54 A. 2d 277 (1947). Such a rule is salutary for courts are not in a position to assemble and evaluate the necessary empirical data which forms the basis for the legislature's findings. The Authorities present data indicating that there is and has been an unemployment problem in Pennsylvania and that industry is and has been declining and the taxpayers counter

---

[8] Industrial Development Authority Law, Act of August 23, 1967, §2, P. L. 1609, 73 P.S. §371(2). Some commentators have argued that industrial development bonds have not been nearly as successful as hoped. See: Note, The Proliferation of Industrial Revenue Bond Financing: Ban the Bond?, 41 Temple L. Rev. 289 (1968); Comment, Financing Industrial Development with Municipal Revenue Bonds, 1967 Ill. L. Forum 331; 7 C.C.H. 1968 Stand. Fed. Tax Rep. ¶6128A. See also: Abbey, Municipal Industrial Development Bonds, 19 Vand. L. Rev. 25 (1965); Pinsky, State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach, 111 U. Pa. L. Rev. 265 (1963).

with evidence that demonstrates that the unemployment problem is not presently very serious and acute. Courts should not be called upon to sift through such data. It is the province of the legislature, not the judiciary, to determine the extent of the unemployment problem in Pennsylvania and to determine the means necessary to combat that problem. Furthermore, the concept of "public purpose" changes through the years. "Views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that today there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of 'public use' naturally expands in proportion.": *Dornan, supra,* at 221. Generally, the legislature, which is more responsive to the people and has more adequate facilities for gathering and assembling the requisite data, is in a better position to evaluate and determine public purpose than are the courts, especially at the appellate level.

All parties are agreed that unemployment is a problem which falls within the police power of the state. See: *Commonwealth v. Perkins,* 342 Pa. 529, 21 A. 2d 45, aff'd, 314 U.S. 586 (1941). The legislature has found that the unemployment problem is sufficiently serious now to warrant that steps be taken to remedy the problem and such legislative finding is entitled to great respect by us. The taxpayers have not convinced us that the legislative findings are unrealistic nor are we convinced by their argument that the legislature has not proved that there is a *present* unemployment problem but that the Act is designed to prevent unemployment in the future. Even if their characterization of the legislature's findings were correct, the taxpayers have not cited any cases holding that it is

not within the police power to prevent a *potentially* serious problem from developing in the future. There is no requirement in the law that the legislature wait until the proverbial horse has escaped before acting.

The taxpayers' main concern is that the party who is really benefiting from this program is the private manufacturer who acquires an industrial plant at a much lower cost than he would have incurred had he built it himself. It is beyond question that private manufacturers receive a very large benefit from this program; however, this fact alone should not invalidate the program. If the legislative program is reasonably designed to combat a problem within the competence of the legislature and if the public will benefit from the project, then the project is sufficiently public in nature to withstand constitutional challenge.

In the cases at bar, the parties have stipulated that the plants will employ 500 persons at the outset and that the projected plants will not replace already existing plants in Pennsylvania. The projects would, therefore, appear to be effective means of combating unemployment since they will create jobs directly. Moreover, there is no constitutional requirement that the *entire* public benefit from a program before that program can be termed "public." "It is not essential that the entire community or even any considerable portion of it should directly enjoy or participate in an improvement in order to make its use a public one.": *Dornan, supra,* at 222. There is another important factor to consider. Industrial development authorities are so prevalent throughout the country that Pennsylvania is at a competitive disadvantage in attracting industry to this state should we declare this act unconstitutional.[9] Even the taxpayers do not maintain

---

[9] See: Note, The Proliferation of Industrial Revenue Bond Financing: Ban the Bond?, 41 Temple L. Rev. 289, 309, n. 86 (1968).

that it is not within the police power of the legislature to attract industry into the state or aid industry presently located in the state if such attraction and aid will alleviate unemployment and increase the opportunities for employment.

On at least three previous occasions we have upheld the creation of authorities which have substantially benefited private citizens. In *Dornan,* we upheld an act creating authorities for the purpose of slum clearance, a project of primary benefit to those persons living in slums for the authorities built new housing for them and we held that the act was an effective means to combat the spread of slums, a problem admittedly within the police power, and the fact that certain private persons benefited substantially and that the public in general received no direct benefit did not derogate from the fact that this was a public project. In *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 54 A. 2d 277 (1947), we upheld the constitutionality of the Urban Redevelopment Law of Philadelphia; *Belovsky* involved essentially the same issues as in *Dornan* and we held that *Dornan* was controlling. In *McSorley v. Fitzgerald,* 359 Pa. 264, 59 A. 2d 142 (1948), we upheld the constitutionality of the Parking Authority Law under the provisions of which authorities were set up to acquire areas for parking lots. The taxpayer in *McSorley* made a similar argument to that made in the instant cases: the authority, although a public body, was engaging in what is essentially a private activity. This Court responded, "It is no constitutional objection to the statute, nor does it derogate from the public character of its objective, that the Authority will to some extent conduct what may heretofore have been regarded as a private enterprise; to hold otherwise would mean that the State would be powerless, within constitutional

limitations, to act in order to preserve the health and safety of its people even though such action were imperative and vital for the purpose.": *McSorley, supra,* at 270.

We conclude, therefore, the Agreements entered into by the Authorities pursuant to the Act are for a public purpose, a conclusion which effectively answers several of the taxpayers' objections. First, the taxpayers maintain that public money is being used for private purposes; while we agree that the money raised through the bonds is public money, the expenditure of this money under this program is for a public, not a private, purpose. Second, the taxpayers maintain that the Act violates the State Constitution in that the plants are tax-exempt as long as the Authorities own the properties, but that in reality it is the private manufacturers who are receiving the benefit of the tax exemption. The taxpayers rely on a line of cases holding that public bodies may not use their property for private purposes and still receive a tax exemption. See: *Moon Township Appeal,* 387 Pa. 144, 127 A. 2d 361 (1956); *West View Borough Municipal Authority Appeal,* 381 Pa. 416, 113 A. 2d 307 (1955); *Pittsburgh v. Allegheny County,* 351 Pa. 345, 41 A. 2d 639 (1945); *Pittsburgh School District v. Allegheny County,* 347 Pa. 101, 31 A. 2d 707 (1943); *Kittanning Borough v. Armstrong County,* 347 Pa. 108, 31 A. 2d 710 (1943). The Authorities counter with a series of cases holding that, if the public body is acting for a public purpose, it does not lose the tax exemption even though the activity in question seems to be nongovernmental in nature. See: *Pittsburgh Public Parking Authority v. Board of Property Assessment, Appeals and Review,* 377 Pa. 274, 105 A. 2d 165 (1954); *Commonwealth, Department of Public Assistance v. Schuylkill County,* 361 Pa. 126, 62 A. 2d 922 (1949); *Commonwealth v.*

*Dauphin County,* 354 Pa. 556, 47 A. 2d 807 (1946);
*Commonwealth, State Employes' Retirement System v.
Dauphin County,* 335 Pa. 177, 6 A. 2d 870 (1939).
The distinction between the lines of authorities lies in
whether a definite public purpose exists in the pro-
posed project. Since we conclude that the instant Au-
thorities are acting for a public purpose in erecting
the plants, the line of cases cited by the Authorities
must control. In *Pittsburgh Public Parking Author-
ity v. Board of Property Assessment, Appeals and Re-
view,* 377 Pa. 274, 105 A. 2d 165 (1954), the parking
authority leased some of its garages to private parties
and the taxing authorities claimed that the garages
were no longer tax-exempt. We responded: "Without
some element of private profit to someone the enter-
prise could not be conducted at all; the determinative
question is whether these public properties are being
used for a public purpose." *Pittsburgh, supra,* at 280.
In the instant cases, even though the properties are
tax-exempt while still owned by the Authorities, the
two manufacturing companies are required to pay an
amount equal to the taxes which would have to be paid
if the properties were not tax-exempt.

The taxpayers place great reliance on our decision
in *Price v. Philadelphia Parking Authority,* 422 Pa.
317, 221 A. 2d 138 (1966). In *Price* the parking au-
thority agreed with two private concerns to build com-
bination parking garages and high rise apartments
and, under the project as planned, when the buildings
would have been completed, very little additional park-
ing space would have been made available to the pub-
lic. "This net increment to the public, in light of the
magnitude of the garage project and the substantial
benefits accruing to public therefrom, is not sufficient
to warrant the public involvement here proposed."
*Price, supra,* at 338. Not only will there be a *substan-*

*tial* benefit to the public in the instant projects but *Price* is inapposite in another respect. We held that the agreements in *Price* violated the enabling act and not the State Constitution whereas, in the instant cases, we are, of course, dealing with a different enabling act and we find no conflict between the enabling act and the two projects.

## II

The taxpayers next allege that the Act and Agreements violate Sections 4 and 8 of Article IX of the State Constitution in that the Authorities are empowered to create debts in excess of the limits imposed on the Commonwealth by Section 4 and on municipalities by Section 8.[10] The taxpayers urge that the word "debt" should not be given a limited, technical meaning intended to emasculate the intent of these two Sections. "Debt and indebtedness in the section in question are not used in any technical way, but in their broad general meaning of all contractual obligation to pay in the future for considerations received in the

---

[10] "No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasions, suppress insurrection, defend the State in war, or to pay existing debt; and the debt created to supply deficiencies in revenue shall never exceed, in the aggregate at any one time, one million dollars . . . .": Section 4, Article IX.

"The debt of any county, city, borough, township, school district, or other municipality or incorporated district, except as provided herein, and in section fifteen of this article, shall never exceed fifteen (15) per centum upon the assessed value of the taxable property therein, nor shall any such county, municipality or district incur any debt, or increase its indebtedness to an amount exceeding five (5) per centum upon such assessed valuation of property, without the consent of the electors thereof at a public election in such manner as shall be provided by law. . . .": Section 8, Article IX.

present.": *Keller v. Scranton,* 200 Pa. 130, 135, 49 Atl. 781 (1901). Relying on this definition, the taxpayers argue that the debt of the Authorities is in reality the debt of the Commonwealth and of the municipalities and thus in contravention of Sections 4 and 8.

The Act specifically states that any money borrowed by an authority shall not be the debt of either the Commonwealth or any political subdivision: "6(c) An authority created hereunder shall have no power at any time or in any manner to pledge the general credit or taxing power of the Commonwealth of Pennsylvania or any political subdivision, and the obligations of the authority shall be limited as provided in section 7(a)[11] hereof. The bonds of the authority shall on the face thereof clearly set forth the foregoing limitation."

The instant revenue bonds issued by the two authorities were issued pursuant to the Amendment, which states: "The board of commissioners of any county are empowered to issue non-debt revenue bonds of the county pursuant to provisions of the act of June 25, 1941 (P. L. 159), known as the 'Municipal Borrowing Law,' and its amendments, to provide sufficient moneys for the . . . construction . . . and . . . equipping . . . of an industrial development project . . . ." Section 621(f) of the Municipal Borrowing Law requires that the bond ordinance state "That the bonds are not general obligations of the municipality and that no property or revenues of the municipality shall be pledged to the payment thereof or the interest and state taxes cove-

---

[11] "An authority shall have the power to issue bonds for any of its corporate purposes, provided, however, the principal, interest and other charges thereon are payable solely and exclusively (i) from the income, revenues and property of the project financed, in whole or in part, with the proceeds of such bonds; (ii) from the income and revenues of certain designated projects whether or not they were financed, in whole or in part, with the proceeds of such bonds; or (iii) from its revenues generally."

nanted to be paid thereon . . . and that no tax shall in any event be levied for the payment of the interest or principal of, or state taxes on, such bonds." (Act of June 25, 1941, P. L. 159, Art. VI, §621(f), 53 P.S. §6621(f).) In short, the statutes controlling the bonds issued by the Authorities and the bonds themselves explicitly and unequivocally state that the bonds are not debts of the Commonwealth nor of any political subdivision of the Commonwealth. Such revenue bonds are quite common in this Commonwealth and purchasers of such bonds are well aware that they cannot look to the Commonwealth or any political subdivision for security.

Our case law supports this position. On numerous occasions we have held that revenue bonds are not debts of the Commonwealth or of any political subdivision: *Conrad v. Pittsburgh,* 421 Pa. 492, 218 A. 2d 906 (1966); *Beam v. Ephrata Borough,* 395 Pa. 348, 149 A. 2d 431 (1959); *Detweiler v. Hatfield Borough School District,* 376 Pa. 555, 104 A. 2d 110 (1954); *Greenhalgh v. Woodworth,* 361 Pa. 543, 64 A. 2d 659 (1949); *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 54 A. 2d 277 (1947); *Williams v. Samuel,* 332 Pa. 265, 2 A. 2d 834 (1938); *Gemmill v. Calder,* 332 Pa. 281, 3 A. 2d 7 (1938); *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 200 Atl. 834 (1938); *Kelley v. Earle,* 325 Pa. 337, 190 Atl. 140 (1937); *Tranter v. Allegheny County Authority,* 316 Pa. 65, 173 Atl. 289 (1934).

The Authorities raise two other points for our consideration. First, the Authorities argue that Section 8 does not apply because the Authorities are creatures of the State and cannot be considered alter egos of the municipalities: however, since we have concluded that no debt was created in the sense that word is used in Sections 4 and 8, this contention need not be con-

sidered. Second, the Authorities urge that we consider Section 10 of Article IX of Proposal 6 of the recently enacted Amendments to the State Constitution which provides that the municipal debt limitation shall not include indebtedness for any project to the extent that it is self-liquidating or self-supporting.[12] Since we believe this to be the present law, we need not consider the effect of this Amendment.

The taxpayers maintain that an illegal debt is created because the Act permits the Authorities "to pledge, mortgage, hypothecate or otherwise encumber all or any part of the property, real or personal, including but not limited to the revenues or receipts of the authority as security for all or any of the obligations of the authority." [§6(b)(13)]. The taxpayers maintain that the right to mortgage the Authorities' property makes the bonds debts of the municipalities, relying on *Lesser v. Warren Borough*, 237 Pa. 501, 85 Atl. 839 (1912). In *Lesser* we held that the constitutional debt limit was violated when the borough floated bonds to buy the water works and used the property of the water works as security for the bonds.

The Authorities counter with the arguments that Sections 4 and 8 do not apply to the Authorities because the Authorities are public corporations and not either departments of the Commonwealth or alter egos of the municipalities and, further, that while the Act permits the Authorities to mortgage the property, both Agreements in the instant cases specifically state that the Authorities shall not have this right.[13] In view

---

[12] ". . . The debt limit to be prescribed in every such case shall exclude all indebtedness (1) for any project to the extent that it is self-liquidating or self-supporting or which has heretofore been defined as self-liquidating or self-supporting. . . ."

[13] "This bond is not a general obligation of the County and no tax shall in any event be levied for the payment of the principal of, the interest on, the premium (if any), or state taxes (if any)

of this factual posture of the instant litigation we need not consider this contention of the taxpayers because it is clearly irrelevant.

### III

The taxpayers argue that the Act and the Agreements violate Sections 6 and 7 of Article IX which prohibit the Commonwealth and any municipality from pledging or loaning their credit to "any individual, company, corporation or association . . . ."[14] In effect, the taxpayers maintain that both the Commonwealth and the two municipalities are lending their credit to the manufacturing companies who are parties to the Agreements.

The Act specifically states that the Authorities shall not have the power to pledge the credit of the Commonwealth or any political subdivision of the Commonwealth.[15] However, we need not rest on the language of the Act alone for there is a fatal flaw in the taxpayers' chain of logic. The money raised by the bonds will go to the Authorities and not to the industrial corporations; the Authorities will own the fac-

on this bond, such principal, interest, premium and state taxes being payable solely from the aforesaid rentals derived by the County from the Project.": Article III, Acquisition Agreement, between Butler Authority and Armco. The other Agreement contains a similar provision.

[14] "The credit of the Commonwealth shall not be pledged or loaned to any individual, company, corporation or association, nor shall the Commonwealth become a joint owner or stockholder in any company, association or corporation." Section 6 of Article IX.

"The General Assembly shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." Section 7 of Article IX.

[15] Industrial Development Authority Law, Act of August 23, 1967, §6(c), P. L. 251, 73 P.S. §371(6)(c).

tories; the corporations will lease the plants from the Authorities. Therefore, if credit is being lent to anyone, it is being lent to the Authorities. On several occasions we have held that authorities similar to the Industrial Development Authorities involved in this case were not individuals, companies, corporations or associations within the meaning of Sections 6 and 7. See: *Bernstein v. Pittsburgh,* 366 Pa. 200, 210, 77 A. 2d 452 (1951); *McSorley v. Fitzgerald,* 359 Pa. 264, 271, 59 A. 2d 142 (1948); *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 345, 54 A. 2d 277 (1947); *Williams v. Samuel,* 332 Pa. 265, 275, 2 A. 2d 834 (1938); *Tranter v. Allegheny County Authority,* 316 Pa. 65, 81, 173 Atl. 289 (1934).

The Authorities have also directed our attention to Section 9, Article IX, Proposition 6 of the newly-adopted Constitutional Amendments. The second sentence of that Section states: "The General Assembly may provide standards by which municipalities or school districts may give financial assistance or lease property to public service, industrial or commercial enterprises if it shall find that such assistance or leasing is necessary to the health, safety or welfare of the Commonwealth or any municipality or school district." The taxpayers do not maintain that this Section does not control the present situation but they argue instead that this Section should only be applied prospectively. However, since we have already determined that the Act does not violate old Sections 6 and 7 of the Constitution, we need not consider the impact of the newly adopted Section 9, Article IX, Proposition 6 of the new Constitutional Amendments. We note in passing, however, that we should be most reluctant to declare this Act unconstitutional and then state that the legislature could re-enact the same law after January 1, 1969 when it would become constitutional.

## IV

The taxpayers allege that the Act, bond ordinances and Agreements all violate Section 31 of Article III of the State Constitution in three particulars. Section 31 states: "The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

The taxpayers argue initially that the Authorities are special commissions within the meaning of Section 31 because the primary beneficiaries of the Act are private corporations and not the public. First, we have already rejected this latter argument in the first part of this opinion. Second, we have held on several occasions that authorities similar to these Industrial Development Authorities are not special commissions in the sense that term is used in Section 31. See: *Evans v. West Norriton Township Municipal Authority*, 370 Pa. 150, 154, 87 A. 2d 474 (1952); *Williams v. Samuel*, 332 Pa. 265, 274, 2 A. 2d 834 (1938); *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 230, 200 Atl. 834 (1938); *Poor District Case (No. 1)*, 329 Pa. 390, 404, 197 Atl. 334 (1938); *Tranter v. Allegheny County Authority*, 316 Pa. 65, 78, 173 Atl. 289 (1934).

The taxpayers next contend that the provisions whereby the Authorities are empowered to lease the property to private industrial concerns violates Section 31 since the industrial concerns are "private corporations" within the meaning of the Section. Section 31 does not prohibit the leasing of public property to private individuals. While the taxpayers have cited no authorities holding that public property cannot be leased to private individuals, several cases have come

before us in which we have, impliedly, approved the leasing of public property to private concerns. See: e.g., *Pittsburgh Public Parking Authority v. Board of Property Assessment, Appeals and Review*, 377 Pa. 274, 105 A. 2d 165 (1954); *Clark v. Public Parking Authority of Pittsburgh*, 372 Pa. 481, 94 A. 2d 576 (1953).

Finally, the taxpayers object to provisions in the bond ordinances appointing local banks as depositories for the funds of the Authorities.[16] All moneys received from the sale of the bonds will be handed over to the Authorities which will deposit the funds in an account held with the depositories and all rentals will go into separate accounts with the depositories. The Authorities will maintain various accounts such as a Principal and Interest Account, Redemption Account and Special Redemption Account. The taxpayers allege that the depositories are "private corporations" within the meaning of Section 31, relying on *Beam v. Ephrata Borough*, 395 Pa. 348, 149 A. 2d 431 (1959) and *Lighton v. Abington Township*, 336 Pa. 345, 9 A. 2d 609 (1939). In both *Beam* and *Lighton* the depository had definite duties *in addition to holding the money* whereas in the instant cases, the depositories are banks, nothing more, and they do nothing except hold the Authorities' money. While we have held that the delegation of details of administration is not a violation of the State Constitution (*Evans v. West Norriton Municipal Authority*, 370 Pa. 150, 160, 87 A. 2d 474 (1952)) it is difficult to conclude in this case that even administrative details have been delegated to the depositories. We conclude that there is no violation of Section 31.

---

[16] Bond Ordinance, Article VII, Sections 7.1, 7.3; Article VIII, Sections 8.1-8.4, Agreement between Butler Authority and Armco. The Bond Ordinance in the Agreement between Hampden Authority and Ralston contains similar provisions.

## V

The taxpayers allege that the provisions in the Agreements permitting the two companies to purchase the properties for $1000 after all debts have been paid violate Sections 1 and 9 of Article I, Section 31 of Article III and Section 7 of Article IX of the State Constitution.[17] In effect, they argue that a sale for such a small sum amounts to a wasting of public assets and, when the bonds have been retired, the property still has great value and should be sold at a competitive price. Moreover, they argue that the public purpose still exists and property used for a public purpose should not be conveyed to private companies.

Under no circumstances can the two companies purchase the properties without assuring that the bonds will be retired. When the Authorities sell the properties, they are not losing money for, through their rent payments, the companies have paid for the projects. The $1000 is a windfall of sorts. Furthermore, if the Authorities are going to charge competitive prices for the plants, private corporations will be less interested in industrial development projects because the cost in the long run will be no cheaper than if they constructed the plants themselves. What is more, just because a plant is sold to a private corporation does not mean that the public benefit ceases for, as long as the plant is used, citizens of the Commonwealth will be employed. Finally, our case law supports this position.

---

[17] "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.": Article I, Section 1.

"In all criminal prosecutions the accused [shall not] . . . be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land.": Article I, Section 9.

In the redevelopment cases, we have approved the sale of homes acquired by the redevelopment authorities to private individuals. See: *Starkey v. Philadelphia,* 397 Pa. 512, 156 A. 2d 101 (1959); *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 54 A. 2d 277 (1947); *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 200 Atl. 834 (1938).

The taxpayers have raised several other objections to the Act many of which have been raised in earlier cases attacking the constitutionality of similar acts and have been rejected. We have considered all of the taxpayers' remaining objections and find them without merit.

In *Basehore* (Appeal No. 91 Misc. Dkt. 16) injunction is denied.

In *Walker* (Appeal No. 167 March Term, 1968) decree affirmed.

Each party to pay own costs.

Mr. Justice COHEN dissents.

Mr. Justice MUSMANNO did not participate in the decision of this case.

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL, January 10, 1969:

In the last few years, tax-exempt Public Authorities (as well as commissions and similar bodies of all kinds and characters) have multiplied like the sands of the sea. Most of them had worthy objectives; some of them were beneficial and really needed; many of them were unrealistic and unwise. Many of them were created unnecessarily and unwisely and solely for political or financial or patronage reasons, or to demonstrate to the voters how "liberal" the creators or advocates were. Often they were merely a tax dodge which exempted the companies directly benefited, but concealed the fact that they would increase the taxes

on all other taxpayers. Legislators and lawyers, the highest political leaders, as well as well-meaning visionaries, *must abandon* the popularly held notion that *a worthy objective legalizes and Constitutionalizes anything and everything*,* whenever the Act or action is cloaked in the spurious guise of public welfare.

An increase in employment in Pennsylvania, which is the recited reason for this Industrial Development Act, and the opportunity for certain corporations doing business in Pennsylvania to meet the competition from other States are worthy objectives which every Pennsylvanian favors.

The Courts have the power, in considering a specific subject or project, to prevent an abuse or an excess of an Authority's power as well as its boundaries, its limitations and its discretion, and a further power to decide whether the means authorized or employed to realize a worthy objective are designed to favor primarily or will result in favoring private interests, or violate any provision of the Constitution. See and compare *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A. 2d 138.

The present Industrial Development Authority Act is, in my judgment, a borderline case. However, in spite of many serious doubts, I will concur in the result. See *Daly v. Hemphill*, 411 Pa. 263, 271, 191 A. 2d 835; *Dauphin Deposit Trust Co. v. Myers*, 388 Pa.

---

* If I were a legislator, I would oppose a large majority of Public Authority Acts, with their alleged noble or worthy or beautiful goals and objectives, but which realistically are often not worth the cost, and often bring hardship and distress to many people, especially in the areas of Redevelopment Authorities. See, for example, Concurring Opinion in *St. Peter's v. Urban Redevelopment Authority of Pittsburgh*, 394 Pa. 194, 199, 146 A. 2d 724; Concurring Opinion in *Faranda Appeal*, 420 Pa. 295, 302, 216 A. 2d 769; and *Schwartz v. Urban Redevelopment Authority*, 411 Pa. 530, 535, 536, 192 A. 2d 371.

444, 450, 130 A. 2d 686; *Evans v. West Norriton Township Municipal Authority*, 370 Pa. 150, 87 A. 2d 474; *Tranter v. Allegheny County Authority*, 316 Pa. 65, 173 Atl. 289.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I concur in the majority's decision sustaining the constitutionality of the legislation and projects here under review; but I should add a few observations regarding one aspect of the case.

As I read the majority opinion, we do not by this decision venture any judgment as to the wisdom or desirability of the use of tax free revenue bonds to foster industrial development; that is a determination entrusted exclusively to the legislature. Ours has been the more limited inquiry of whether the legislative judgment to proceed in this fashion exceeds the boundaries of the constitutionally permissible.

Our conclusion that the legislation and projects serves a "public purpose" in part reflects an evolution in attitude prompted by the changing nature of our public needs. It also reflects the deference courts must accord to the legislative branch where fundamentally at issue is the appropriate role of government in meeting those needs. In this area, there may be no pretense that we sit as a superlegislature.

Once it is accepted that the reduction of unemployment and the reversal of economic decline are a legitimate concern of government, our sole inquiry is whether the particular approach selected—the fostering of new plant development—is reasonably calculated to realize that objective.

In the instant case, appellants argue that the legislation and projects serve no useful public purpose, but are designed primarily to facilitate private interests. This contention, however, in the context of this case,

misapprehends the public purpose doctrine and the extent to which courts may interpose themselves in the resolution of essentially legislative questions. That doctrine was not intended to preclude legislative innovation reasonably calculated to realize police power objectives.

Appellants have relied heavily on *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 221 A. 2d 138 (1966). As the majority correctly points out, that case is narrowly speaking inapposite because it was decided not on constitutional grounds, but on the basis that the specific projects under attack were not authorized by the enabling legislation. Yet in a broad sense, we deal here with the same basic problem. If the instant projects were determined not to be essentially "public," in that the benefit accruing to the local communities were found not sufficient to justify the public involvement, then our conclusion must necessarily be in accord with that reached in *Price*.

In *Price*, the public authority's mandated role was to provide public parking. Yet the only benefit to the public after an investment by the parking authority of $8,000,000 to $9,000,000 was the addition of 180 parking spaces over that generally available prior to the project. *Id.* at 321, 338. Two-thirds of the parking spaces created were to be utilized primarily by the private commercial tenants of the structure housing the facility. The public thus was unable to benefit from the greater part of the project. But while there was a minimal gain to the public, there was numerous and significant benefits to the private developer.

In the instant case, although the immediate beneficiary is intended to be the industrial lessee, it acts solely as a conduit by which the public may realize the ultimate benefit of local economic growth. Here,

unlike *Price,* the totality of the projects will be devoted to their stated purpose—the reduction of unemployment through the creation of new plant development. While private interests are necessarily aided, the purpose of this aid is to foster a vital public interest. Thus, within the confines of this specific program and its objectives—far more subtle than the direct provision of a public service such as public parking—industrial lessees are functionally only incidental beneficiaries, necessary to the realization of an essentially public objective.

Fundamentally, the instant programs involve no more than the creation of an atmosphere conducive to industrial and economic growth by providing the mechanism for the realization of permissible tax benefits. No public property is devoted, nor credit lent to the industrial lessee. Nor are there any local advantages exempting the private users from taxation (in light of the agreements for payments in lieu of taxes) or regulation. On this basis, we would be loath to deprive local communities within this Commonwealth of the opportunity to compete with the numerous other jurisdictions (many of which adjoin Pennsylvania) making available similar inducements for economic expansion and growth.

Today's decision will not preclude the courts from preventing an abuse of an authority's discretion in participating in a specific project. What would constitute such abuse within the confines of this program need not be here specified. It suffices for present purposes, however, to state that in the instant cases no such abuse has been suggested or called to our attention. For these reasons, I concur in the result reached by the majority.