**Short Term Disaster Relief Program**

CREAMER, Attorney General, October 27, 1972.—
You have requested our opinion regarding the legality

of the short-term disaster relief loan program of the Department of Commerce (hereafter "department") undertaken as part of the Commonwealth's effort to combat the effects of the tropical storm of June, 1972. It is our opinion, based on the discussion which follows, that: (1) the program is legally authorized; (2) the funds used by the department have been legally appropriated; and (3) the program is constitutional.

A. *Background*

You have advised that the purpose of the program is to provide assistance to business enterprises within the Commonwealth of Pennsylvania which suffered hurricane or flood damage as a result of the storm. This will be accomplished by loans for a maximum period of 180 days to enable the rehabilitation of such enterprises pending the availability of disaster loans to be made by the Small Business Administration of the United States under its mandate in 15 USC §636 and 42 USC §4411. These latter loans, which are permanent in nature require an extensive length of time to consummate. Your department will make the loans to industrial development authorities (hereafter "authorities") as defined in the Industrial and Commercial Development Authority Law of August 23, 1967, as amended, 73 PS §371, et seq. (hereafter "law"). The authorities in turn will lend the proceeds to flood-damaged business enterprises to rehabilitate the damaged or destroyed portions of such enterprises, in accordance with section 6(b)(15) of the law, added by Act No. 2 of First Special Session of 1972, approved September 1, 1972. The loan documents provide for an interest rate of two percent per annum and require as a condition of the loan that the authorities and the enterprises who receive loans from the authorities will diligently pursue the obtaining of permanent loans from the Small Business Administration, and that

upon receipt of such loans from the Small Business Administration, the loans made by the department under this program will be immediately repaid.

Once a loan is made, the proceeds are to be deposited by the authority in an escrow account and may be released only upon approval of work accomplished by the department, the authority, and the damaged business enterprise. In addition, you will certify each of the loans in accordance with the requirements of section 7(f) of the law, 73 PS §377(f).

The note from the authorities to the department further provides that: "Notwithstanding any other provision herein to the contrary, this Note shall not in any manner pledge the general credit or taxing power of the Commonwealth of Pennsylvania, or any political subdivision, and the obligations hereunder of the undersigned shall be limited to the aforementioned collateral security."

Funds for the program have been made available by the Governor under Act No. 18-A of July 7, 1972.

B. *The program is legally authorized*

The above program which you have outlined is authorized by law. The Department of Commerce is broadly charged under the Commerce Law of May 10, 1939, P. L. 111, 71 PS §1709-1, et seq., with the power to encourage business, industry and commerce in the Commonwealth of Pennsylvania. Specifically, section 2, as amended, 71 PS §1709-2, provides for the rehabilitation and expansion of business, industry and commerce. Section 3, 71 PS §1709-3, empowers the department, inter alia, to promote and encourage the protection of the legitimate interests and welfare of Pennsylvania business, industry and commerce; to investigate and study conditions affecting Pennsylvania business, industry and commerce; and to investi-

gate and study conditions of unemployment and recommend specific remedies for, and to aid in, the restoration of employment in communities affected by unemployment. In our opinion, the encouragement, through the short-term loan program, of the rehabilitation of flood-damaged business enterprises, falls clearly within that mandate. There is no doubt that unless such enterprises are rehabilitated, business and industry and commerce in Pennsylvania will suffer greatly with attendant unemployment.

In addition, under section 2501-B of the Administrative Code of 1929, added May 10, 1939, P. L. 101, sec. 7, as amended, 71 PS §669, the Department of Commerce is empowered to take any other action authorized or required by law: 71 PS §669(b). Moreover, by Act No. 275 of December 3, 1970, sec. 26, 71 PS §669(d), the department is authorized to enter into mutually satisfactory agreements to carry out the objectives of the department, which includes the making of grants.

The means for the department to carry out these powers and authorizations with respect to the tropical storm of June 1972 were provided on September 1, 1972, by the enactment of Act No. 2 of First Special Session of 1972, which amended the Law by authorizing authorities to sponsor "disaster relief projects" pursuant to the provisions of the Law. Section 6(b)(15). "Disaster Relief Project" is defined in Section 3(18) of the law (as added by Act No. 2) as:

"Any undertaking to rehabilitate, repair, reconstruct, clean-up, replace, or otherwise return to economic use any land, site, structure, or facility, including machinery, equipment and tools damaged or lost due to disaster of flood or fire or other casualty caused by the floods of September 1971 or June 1972 and comprising or being a part of an industrial, commercial,

agricultural, utility, manufacturing or research or development enterprise."

On the basis of the foregoing, it is clear that the program of making short-term disaster loans to authorities for use in disaster relief projects in connection with the tropical storm of 1972 falls within the powers granted to the department.

### C. *The Department's use of appropriated funds for the program is legal*

Turning next to the source of the loans, we find that the Department is making a legal and proper use of funds. The General Assembly in Act No. 18-A of July 7, 1972, specifically appropriated to the Governor $113,000,000, "for *emergency and disaster relief* especially in connection with the tropical storm and flood damage of June, 1972; for emergency use in the alleviation of human hardships and suffering and *for the protection of property.*" (Italics supplied.) As part of this appropriation, the Governor has made available to the department the sum of $50,000,000 to carry out the short-term loan program.

We have no difficulty in finding that the program you have outlined is for emergency and disaster relief in connection with the flood. Indeed, the Legislature used the same words to describe the program the Department is funding under section 6(b)(15) of the law, which authorizes "disaster relief projects." Additionally, the Appropriation Act allows funds "for the protection of property," the very purpose of these loans.

Moreover, we have no difficulty in finding that the department may lend appropriated funds to industrial development authorities. Under section 6(b)(12) of the law, 73 PS §376(b)(12), the various authorities are authorized:

". . . *to borrow money* and accept grants *from* and to enter into contracts, leases or other transactions with any Federal agency, *Commonwealth of Pennsylvania or its agencies or instrumentalities,* municipality, school district, bank or other financial institution, corporation or other authority." (Italics supplied.)

The specific authorization of an authority to borrow money from the Commonwealth of Pennsylvania must reflect a concomitant right of the Commonwealth of Pennsylvania to so lend the money under appropriate authorization. This authorization, as we have noted, is found under the powers granted to the Department of Commerce.

### D. *The program is constitutional*

We further hold that the program within the legal authorities cited is constitutional. See our Opinion No. 128, 2 Pa. B. 1316.

We first note that the law, under which the program will be undertaken, was specifically held to be constitutional by the Supreme Court of Pennsylvania in Basehore v. Hampden Industrial Development Authority, 433 Pa. 40 (1968). In that case, the Supreme Court considered a broad challenge to the Law and held that its provisions constituted a public purpose: to combat unemployment and encourage industrial development. The amendment of the law to allow funding for disaster relief projects is certainly as important and clearly a public purpose as the original provisions of the Law. The destruction and hardships which the tropical storm of June, 1972, have caused are matters of public concern and are too well known to need further detail here. While individuals may ultimately be benefited, the benefit to the public as a whole of restoring employment and industry to the Commonwealth are certainly the primary purposes of the pro-

gram and it is therefore constitutional. In the words of the Supreme Court:

"If the legislative program is reasonably designed to combat a problem within the competence of the legislature and if the public will benefit from the project, then the project is sufficiently public in nature to withstand constitutional challenge": 433 Pa. 40, 50.

In addition, we note that Article VIII, sec. 7 of the Pennsylvania Constitution specifically provides that the Commonwealth may incur debt without limit to " 'rehabilitate areas affected by man-made or natural disaster' ". If the Commonwealth may incur debt for such purposes, it most surely may expend funds for such purposes whether the funds are borrowed or appropriated. The constitutional provisions would be meaningless if the Commonwealth could borrow funds but not expend them in a proper program such as the disaster relief program specifically authorized by law.

We believe that the discussion in Basehore also disposes of any challenge to the program under Article III, sec. 29 of the Pennsylvania Constitution which provides in pertinent part:

"No appropriation shall be made for charitable, educational or benevolent purposes to any person or community. . . ."

The predecessor to this section under the Constitution of 1874 was Article III, sec. 18, which provided similarly that:

"No appropriation, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community. . . ." The exception for pensions and military service is found further on in present Article III, sec. 29.

The history of the construction of this section shows a growing limitation upon the scope of its prohibitive

effect. In Busser v. Snyder, 282 Pa. 440 (1925), for example, an act making grants to the aged was struck down as unconstitutional because it was regarded as pure charity. The defense that it was a "poor person law," and thus part of the recognized business of government was rejected because the recipients of the grants were allowed to have incomes and own property. The court limited the class of poor people entitled to governmental assistance to those completely destitute. However, seven years later, the Supreme Court modified its position when faced with an attempt to alleviate the widespread unemployment which existed during the depression era. In Commonwealth ex rel. Schnader v. Liveright, 308 Pa. 35 (1932), the court upheld an act which gave an appropriation to the Department of Welfare to be allocated to poor districts for relief of the poor unemployed. The court there broadened the application of the word "poor" to cover unemployed people who would become a direct charge on the body politic if they were not given relief. The test laid down by the court for constitutionality of such appropriations was whether they carried out the obligatory public duties of government.

Full circle was reached with Commonwealth v. Perkins, 342 Pa. 529 (1941), aff'd per curiam, 314 U.S. 586 (1942), which sustained the Pennsylvania unemployment compensation law against a challenge that it violated Article III, §18, and held that Busser no longer reflected the proper application of the constitutional prohibition. The Supreme Court, adopting the opinion of the court below stated (342 Pa. at 534):

" 'We now hold that unemployment is a governmental concern and it is a matter of discretion as to how the legislature shall deal with it. . . .

\*     \*     \*     \*     \*

" 'If appropriations to perform the obligatory duties are not charities or benevolences [following the *Liveright* case], it would seem to be a refinement to hold where there is a governmental concern with which the legislature has discretionary power that it would be a benevolence merely because the one is obligatory and the other discretionary.' "

Finally, in Loomis v. Philadelphia School District Board of Education, 376 Pa. 428 (1954), the court sustained an act allowing public employes to attend Army Reserve training with pay. The court there set down the rule that the section of the Constitution applies only to charitable gratuities made without any corresponding benefit derived by the public from the class to be benefited. In laying down and applying this test, the court distinguished Kurtz v. Pittsburgh, 346 Pa. 362 (1943), where benefits intended for the wives and children of service men were held to be a pure gratuity and thus unconstitutional. Since, in Loomis, the public did derive benefit in encouraging persons to remain in the Army, it was held that the pay was not a mere gratuity and was therefore constitutional.

Returning again to Basehore, we note first, with some interest, that Article III, sec. 29 of the Constitution was not even raised or discussed in the broad-based challenge presented in that case, an indication that it was not considered to be a serious problem. Moreover, we believe that the discussion of the court, 433 Pa. at 47-54, covers the problem. In that discussion, the court held that the law was for a public purpose, specifically that unemployment is a problem that falls within the police power of the State, citing the Perkins case, 433 Pa. at 49. In so doing, we believe that the court implicitly held that the law, under which the described program will operate,

does not violate Article III, sec. 29, for the reasons that Perkins specifically made that holding in face of a challenge under the predecessor of Article III, sec. 29.

We therefore have no hesitation in holding that Article III, sec. 29 of the Pennsylvania Constitution presents no bar to the short-term disaster relief loan program of the Department. Under either the Perkins or Loomis tests, the program is valid under Article III, sec. 29. The problems of unemployment are clearly a concern with which the government has the constitutional power to deal, and there is certainly a benefit derived to the public at large from the class to be benefited by the program. Finally, there is no gratuity or charity involved in the program because nothing is given away. It is not grants which will be made but loans secured by notes and repayable in the near future from the Federal loans to which the recipients are entitled.

Finally, we turn to Article VIII, sec. 8, of the Pennsylvania Constitution under which questions have been raised regarding this program. This section of the Constitution provides:

"The credit of the Commonwealth shall not be pledged or loaned to any individual, company, corporation or association nor shall the Commonwealth become a joint owner or stockholder in any company, corporation or association."

The only case we have found which purports to construe this section or any of its predecessors is the Basehore case itself, in which the court quickly laid to rest the constitutional challenge in the following language, 433 Pa. at 58-59:

"The Act specifically states that the Authorities shall

not have the power to pledge the credit of the Commonwealth or any political subdivision of the Commonwealth. However, we need not rest on the language of the Act alone for there is a fatal flaw in the taxpayers' chain of logic. The money raised by the bonds will go to the Authorities and not to the industrial corporations; the Authorities will own the factories; the corporations will lease the plants from the Authorities. Therefore, if credit is being lent to anyone, it is being lent to the Authorities. On several occasions we have held that authorities similar to the Industrial Development Authorities involved in this case were not individuals, companies, corporations or associations within the meaning of [Article VIII, §8 of the Constitution]."

See also our Opinion No. 128, supra.

It is clear from Basehore and from the words of the constitutional provision that only where the credit of the Commonwealth is involved can there by any question of constitutionality. In this case, similar to Basehore, the notes used specifically state that the credit of the Commonwealth is not being pledged. More important, in our opinion, no credit of the Commonwealth is being pledged in this case, and, therefore, the constitutional section has no application here.

As we have stated, this section of the Constitution has received scant judicial attention, and no construction on the question of the breadth of the prohibition. However, there is a companion restriction on local governments now found in Article IX, sec. 9, of the Constitution, the history of which is instructive. This section denies to a municipality authorization ". . . to obtain or appropriate money for, or to loan its

credit to, any corporation, association, institution or individual."

This section not only prohibits the pledge or loan of credit, as does Article VIII, sec. 8, it also prohibits the "obtaining" or "appropriation" of money for the purposes set forth. By the application of normal standards of construction, we derive from a juxtaposition of Article VIII, sec. 8, with Article IX, sec. 9, that the constitutional use of the term, "pledge of credit" means just that and does not include the appropriation of treasury funds which have not been raised by the incurring or guaranty of debt. This conclusion, moreover, is amply supported by historical analysis.

The language of Article VIII, sec. 8, first appeared in an amendment of 1857 to the Constitution of 1838: 5 Debates of Constitutional Convention 291 (1873). It was followed in the 1874 Constitution in Article IX, sec. 6, with no proposals brought forth to change or repeal it. Pennsylvania Constitutional Convention (1967-1968), Taxation and State Finance 33-34. Similarly, Article IX, sec. 9 first appeared as an 1857 amendment to the 1838 Constitution in order to eliminate municipal subscriptions and debt for local railroads, which had been costly to municipalities: Buckalew, An Examination of the Constitution of Pennsylvania 219 (1883); White, Commentaries on the Constitution of Pennsylvania 422-425 (1907); 6 Debates of Constitutional Convention 141 (1873). Prior to 1874, the appropriation of funds was not prohibited, just the obtaining of money and loan of credit. Thus, in Speer v. School Directors of Blairsville, 50 Pa. 150 (1865), the right of a borough to borrow funds to pay bounties for those volunteering for the Union Army was upheld against a constitutional challenge under this section. The court first held that the only issue was whether the obtaining of money is involved. ". . .We have before us no

. . . mere loan of credit": 50 Pa. 150, 162. It went on to hold that the illegal obtaining of money was not involved because the sense of the provision was restricted to the loan of public money or credit to private parties.

The Constitution of 1874 strengthened the section by the inclusion of a prohibition against appropriation of funds.

"The convention did nothing to weaken the force of the amendment of 1857, and on the contrary added to its strength by inserting the word 'appropriate' . . . The words 'obtain money for or loan its credit to' applied only to the use of the liability or the credit of the municipality; but the insertion of the word 'appropriate' expanded the effect of the section, so as to embrace money in the treasury itself": Wilkes-Barre City Hospital v. County of Luzerne, 84 Pa. 55, 60 (1877).

The Supreme Court thus held that the prohibition against the lending of credit is a limited one. The provision does not prohibit the appropriation and use of public funds, just the borrowing of funds. Specific language is necessary to prohibit a mere appropriation. Accordingly, in this case we conclude that the implementation of the short-term disaster loan program does not constitute a pledge or loan of credit. The Commonwealth has not borrowed money or issued bonds in order to raise the funds used in this case; nor has the Commonwealth guaranteed any repayment of funds.

On the basis of the above analysis, it is our opinion, and we therefore advise you that the program you have outlined, if carried out in the manner you have set forth and with the use of the documents you have submitted, is legal and is designed to carry out the best interests of the Commonwealth.