**[J-18-2025] [MO:McCaffery, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| PSP NE, LLC | : | No. 38 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court dated March |
| | : | 30, 2023 at No. 576 CD 2022 |
| | : | Reversing the Order of the |
| PENNSYLVANIA PREVAILING WAGE | : | Pennsylvania Prevailing Wage |
| APPEALS BOARD | : | Appeals Board dated May 17, 2022 |
| | : | at No. PWAB-1G-2020. |
| | : | |
| APPEAL OF: BUREAU OF LABOR LAW | : | ARGUED: April 8, 2025 |
| COMPLIANCE | : | |

**<u>CONCURRING OPINION</u>**

**JUSTICE MUNDY**                    **DECIDED: May 19, 2026**

I join the result reached by the majority, but I have reservations about some of its rationale, primarily involving its criticism of *500 James Hance Court v. Pennsylvania Prevailing Wage Appeals Board*, 33 A.3d 555 (Pa. 2011) ("Hance"). While the majority announces that "[t]oday, we recognize that the explicit text of the PWA requires a consideration of all relevant circumstances to determine whether a pre-development lease is a bona fide lease," Majority Op. at 2, nothing in *Hance* suggested otherwise, and indeed, such assertion is arguably tautological as it states that when a factor is relevant in the determination, a reviewing court should consider it – a proposition that is true in applying any statute. A fair reading of *Hance* reflects it sought ways to discover whether a document purporting to be a predevelopment lease was in fact a disguised construction contract – an issue the Court considered the primary one raised in that appeal. *See Hance*, 33 A.3d at 569. As for its alleged "fail[ure] to define what a facially legitimate

lease is," the term "lease" is not used in the relevant statute, and its well-understood meaning is not presently in dispute (nor was it in *Hance*), while the concept of facial legitimacy plainly refers only to the face of the document.[1]

Below, I provide a brief introductory note about predevelopment leases, a review of the *Hance* decision, and an explanation of how I would apply it in the context of the instant dispute.

### A. Predevelopment leasing: benefits and issues

Predevelopment leasing – the leasing of a property before it is constructed and ready for occupancy – is a business practice with benefits to both sides of the transaction. Tenants can reserve space before it is available to the public, sometimes at a discount, and they can often obtain customization for their space.[2] Developers can gauge demand and ensure future occupancy before project construction or completion. This tends to mitigate the financial risks associated with new construction and reduce the likelihood of the property sitting vacant, which in turn helps secure financing as lenders are more likely to provide a loan if they see demand for the property. Developers can also assess market demand and adjust their plans accordingly.

Because money is fungible, rental payments made by tenants can, in some sense, be viewed as retroactively funding the construction project, at least to the extent they exceed the landlord's ongoing costs (hereinafter, "carrying costs"). *See Basehore v.*

---

[1] *See, e.g.*, *Commonwealth v. Edmunds*, 586 A.2d 887, 891 (referring to the possibility of salvaging a search warrant from "facial invalidity" by considering testimony "outside the four corners of" the probable-cause affidavit). *See generally* BLACK'S LAW DICTIONARY 590 (6th ed. 1990) (defining the face of an instrument as that which is shown by the language employed without resort to extrinsic facts or evidence); WEBSTER'S NEW WORLD COLLEGE DICTIONARY 507 (4th ed. 1999) ("what is shown by the language of a document, without explanation or addition").

[2] Nevertheless, the rental payments do not begin until the tenant takes occupancy.

*Hampden Indus. Dev. Auth.*, 248 A.2d 212, 223 (Pa. 1968) (explaining that certain companies "paid for the projects" in question "through their rent payments").[3]   The presence of a predevelopment lease can lend itself to viewing the future rental payments in this way because the building owner depends on those payments when it secures construction financing and builds the project.   Where public funds are used for such payments, this raises questions about whether the contract is a *bona fide* lease or a disguised construction contract, which makes a difference for prevailing-wage purposes. One factor that tends to signal the developer is a traditional landlord, is if the developer maintains a reversionary interest in the property at the end of the lease, and the building's useful life is known or judged to be substantially greater than the lease term.  *See, e.g.*, *Hance*, 33 A.3d at 575.  Another factor is the allocation of the traditional risks of property ownership, as discussed below.

As with the present case, *Hance* involved a predevelopment lease.  The Court identified three issues for resolution:  under what circumstances does a predevelopment lease trigger regulation under the Pennsylvania Prevailing Wage Act (the "PWA"), to what degree may parties who have entered into a lease involving public funds alter their business arrangement to eliminate the public-funding aspect for one well-defined facet of the project, and in this regard may they phase construction into a privately-funded shell stage and a publicly-funded fit-out stage?  *See Hance*, 33 A.3d at 569-70.

### B. Using construction phasing to eliminate public funding for part of the project

*Hance* considered the second and third questions to be "interrelated," *id*. at 570, and it addressed them first.  It observed there was no applicable estoppel or other theory freezing the initial lease arrangement in place, and hence, the parties remained free to

---

[3] Appellee lists many of its ongoing post-occupancy carrying costs at pages 5-6 of its brief.

substitute it with a new predevelopment lease at their will. The Court also acknowledged that staging the construction into two phases consisting of a generic shell, and an initial customized fit-out tailored to the first tenant, was a rational commercial practice. *See id*. at 570-71. Referencing *Penn National Mutual Casualty Insurance Co. v. PWAB*, 715 A.2d 1068, 1074 (Pa. 1998) ("Penn National I") (holding that nothing in Section 5 of the PWA mandates that an entire construction project be covered by the PWA), the *Hance* Court cautioned that courts should not approve of artificial construction phasing having no independent business justification, but that *Penn National I*'s rationale, by its terms, "extends to major, commonly-appreciated construction milestones, such as the completion of site preparation or of a commercial building's shell." *Hance*, 33 A.3d at 572.

In terms of the ability to avoid prevailing wages in this respect, *Hance* analogized to the concept of "tax avoidance," where a taxpayer arranges transactions in compliance with existing laws as a means of paying lower taxes – as contrasted with "tax evasion," which is fraudulent and would arise from "an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." *Id*. at 570 n.22 (quoting *Gregory v. Helvering*, 293 U.S. 465, 470 (1935)). In this regard, and respectfully, I depart from the majority to the extent it may be construed to suggest Developer's "desire[] to avoid the application of the PWA" counts as "circumstantial evidence establishing that the State Police's rent payments fund the costs of construction." Majority Op. at 29. As noted, *avoidance* of regulatory requirements through compliance with applicable laws is proper regardless of motivation, while *evasion* through artifice is not.

Although the dissent in *Hance* found such analogy inapt because tax laws are to be strictly construed while the PWA is to be liberally construed, the *Hance* majority noted in response that *Helvering* had nothing to do with strict construction. While it was

nominally a tax case, its purport was that legislative drafting defines the scope of the relevant enactment's commands with respect to the structuring of transactions. Here the PWA does not compel all developers to use public money, a limitation that exists regardless of the PWA's remedial purpose. The *Hance* majority also stressed that the transaction under review had always involved a predevelopment lease, which tended to undermine the suggestion that the new leasing arrangement was a subterfuge. *See id.* Presently, the majority quotes from the *Hance* dissent, but it omits and does not otherwise account for the *Hance* majority's rejoinder. *See* Majority Op. at 22-23.

The *Hance* Court concluded its discussion of the second and third issues by expressing that *Penn National I*'s analysis does not answer all questions arising in a predevelopment lease context. It indicated the Court's main focus going forward would be in identifying the litmus that courts should use to detect "artful drafting of contracts to evade wage regulations," observing that a multi-factored standard utilized by the United States Labor Department's Administrative Review Board in *In re Phoenix Field Office, Bureau of Land Management*, ARB Case No. 01–010, *reprinted in* 2001 WL 944696 (June 29, 2001) (the "Phoenix Field Office test"), was one possibility. *Hance*, 55 A.3d at 572.

### C. Predevelopment leases, ownership, and risk allocation

The *Hance* Court then turned to the primary question presented: how to determine whether a predevelopment lease constitutes disguised construction financing with taxpayer dollars, thereby implicating wage regulation – the issue that most closely relates to the element in the definition of "public work" involving payment with public funds. *See id.* (citing 43 P.S. § 165-2 (defining a public work, in relevant part, as one that is "done under contract and paid for in whole or in part out of the funds of a public body")). In other words, does the stream of rent payments under the lease, in reality, amount to construction financing? *Hance* explained that labels used in transaction documents do

not control the inquiry if the economic reality is different, as such would open the door to artifice. In scrutinizing the transaction, the Court observed, the *Phoenix Field Office* factors are valid, *see id*. (acknowledging that the test supplies "one method for considering the economic reality" of a predevelopment lease), but they are framed in a highly generalized way. They are stated to be lease length, government involvement, private versus public use, recapture of construction costs, and evasive drafting – with this last element being the only one that would "bear substantial independent significance if proven." *Id*.

In other words, evasive drafting is the key. But it will rarely be conceded by the parties, so the question for the agency and for reviewing courts is how to discover it. *Hance* refrained from explicitly adopting the *Phoenix Field Office* factors at that juncture – without suggesting those factors should never be used in a future case – given they did not account for a key facet of business transactions bearing on economic reality: the allocation of the risks associated with ownership, including the risk that future rental payments might cease.

Drawing on a United States Supreme Court decision that happened to arise in the tax context (although that context was irrelevant), *Hance* explained that if the developer bears the business risk "should anything go awry in the later years of the lease," *id*. at 573 (quoting *Frank Lyon Co. v. United States*, 435 U.S. 561, 576-77 (1978)), the developer is likely the true owner of the property – and thus a *bona fide* landlord. This is because a rational business will not bear financial risk for nothing, but for the expected commercial benefits of property ownership. To the extent the majority suggests this improperly shifted the focus from the statutory "paid for" litmus to "new concerns" involving ownership, Majority Op. at 22, I respectfully disagree. *Hance* simply highlighted one way to discern that monetary remittances from a public body which, under the governing

contract, appear to constitute rent payments, are in fact being used to pay for construction. In this way, its focus on ownership was tied directly to the statutory "paid for" prerequisite. Indeed, the whole point of both *Hance* and the present exercise is that contracts that, facially, are predevelopment leases tagging payments to occupancy, may conceal the economic reality that *public monies are in fact being used to pay for construction services* – and one way to drill down into that reality is to look at who will end up owning the building once it is constructed. *Accord* Majority Op. at 26 (framing the question before this Court as "whether the rent payments are exchanged, at least in part, for the service of constructing the facility").

Risk is important to that determination. If a building's only ability to generate income is through rent, the expected rental payments in excess of carrying costs can, in one sense, be viewed as retroactively paying for construction in every instance. *See Hance*, 33 A.3d at 574 (acknowledging that "few office buildings would be built if the construction costs, including the cost of servicing the construction loan, could not ultimately be recouped by anticipated lease payments within a reasonable time frame"). But it would be tenuous to suggest on those grounds that public money "paid for" the construction of a project every time a completed building is subsequently rented to a public entity under a predevelopment lease. In some circumstances, a public entity might just want to reserve space in an office building before it is built without paying for its construction. A predevelopment lease that leaves the risk of ownership with the developer does not substantially alter that perspective, and hence, in that setting rental payments do not embody retroactive construction financing any more than rental payments made pursuant to a traditional post-development lease. But the same is not

true of a predevelopment lease pursuant to which the ownership risks are borne by the tenant.[4]

Given these realities, *Hance* observed first that while the PWA is remedial, it does not by its terms encompass privately-financed construction. *See Hance*, 33 A.3d at 573 & n.24 (acknowledging the General Assembly is free to change the PWA's scope). That being the case, where the developer shows it bears the risks normally associated with long-term property ownership and the lease in question facially only requires rental payments from the public body, the developer has established a *prima facie* case that wage regulation is not implicated. The burden then shifts to the Bureau to present evidence that the underlying reality of the transaction is different than it appears on the surface. *See id*. at 573-74. Although the majority describes this burden shifting scheme as "novel," Majority Op. at 22, it is well known in many areas of the law,[5] and is a matter of "elemental logic and fairness." *Hance*, 33 A.3d at 576; *see also id*. at 573 n.25 (citing 31A CJS *Evidence* § 199 (2011)). It is the way issues are often decided in court, as we explained more than 90 years ago:

---

[4] The Bureau agrees risk allocation is "a prominent consideration in determining whether any public funds are paying for construction costs." Brief for Appellant at 16. It explains:

> Risk allocation offers a way to both understand whether a private developer is avoiding costs, or potential costs, but shifting its risk to a public body, and to look into the future to determine whether public funds are likely to be eventually expended to cover construction costs over time.

*Id*. at 31.

[5] *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (employment discrimination); *Batson v. Kentucky*, 476 U.S. 79, 97 (1986) (race-based peremptory challenges); *Nardone v. United States*, 308 U.S. 338, 341 (1939) (suppression of incriminating evidence); *In re Fortieth Statewide Investigating Grand Jury*, 220 A.3d 558, 568 (Pa. 2019) (disclosure of records claimed to be protected by a privilege); Gussom v. Teagle, 247 A.3d 1046 (Pa. 2021) (service of process); *Borough of Perkasie v. Moulton Builders, Inc.*, 850 A.2d 778 (Pa. Cmwlth. 2004) (conditional use applications in zoning matters).

> In every lawsuit, somebody must go on with it; the plaintiff is the first to begin, and if he does nothing he fails. If he makes a prima facie case, and nothing is done by the other side to answer it, the defendant fails. The test, therefore, as to the burden of proof is simply to consider which party would be successful if no evidence at all was given, or if no more evidence was given than is given at this particular point of the case; because it is obvious that during the controversy in the litigation there are points at which the onus of proof shifts, and at which the tribunal must say, if the case stopped there, that it must be decided a particular way . . .. Now that being so, the question as to onus of proof is only a rule for deciding on whom the obligation rests of going further, if he wishes to win.

*Henes v. McGovern*, 176 A. 503, 506 (Pa. 1935), *quoted in Hance*, 33 A.3d at 575-76.

Once the developer establishes a *prima facie* case, *Hance* acknowledged that evidence of evasive lease drafting can still exist if the Bureau demonstrates, for example, that the rental payments allow recoupment of construction costs in an unusually short time period for the industry,[6] or the public-body tenant holds an option to purchase the building at the end of the lease term for a below-market price. On the other hand, reversion of the premises to the developer at the end of the lease, and the note being secured by a mortgage rather than the stream of rental payments, tend to show the transaction is a *bona fide* lease. *See Hance*, 33 A.3d at 574-75.

### D. Applying the PWA and Hance to this case

The lease presently under review is readily distinguishable from the one in *Hance* because it does not involve a bifurcated project with a generic shell and customized fit-out, but a build-to-suit transaction for the entire project. *Cf. id*. at 575 (indicating the Bureau did not account for aspects of the lease that seemed inconsistent with its being a disguised build-to-suit contract). The parties negotiated and executed an agreement

---

[6] The time period matters because of the time value of money. The nominal value of all rent payments when added up might equal or exceed the construction costs, but the discounted present value of the future stream of rental payments could, at the time of construction, be far lower depending on the timeframe involved.

covering both construction costs and tenancy. *Accord* Brief for Appellant at 26-27 (distinguishing *Hance* on that basis and observing that, here, there is "one work" and one build-to-suit agreement governing that work and requiring the payment of public monies). Although the payments commence once the project is developed and the Pennsylvania State Police begins occupancy, and although Appellee holds a reversionary interest, construction costs for customization are purposefully built into the amount of the rent, and the agreement reflects that rent is contingent upon the developer's construction to the State Police's specifications. The agreement also gives a great deal of control to the tenant in matters of construction, *see, e.g.*, Brief for Appellant at 9-10 (explaining the predevelopment lease includes 128 pages of specifications the developer must follow, encompassing such detailed items as an evidence room, firing range, arms storage facility, vehicle-related storage areas, and the installation of a 30-inch plaque with the State Seal – and alleging these specifications make it a "build-to-suit lease agreement"), all of which suggests the *Hance* burden-shifting framework has not been invoked in the first instance because the developer has not established an initial *prima facie* case that wage regulation is not implicated.

Finally, the State Police have assumed at least some of the risk by agreeing to pay the developer's unamortized construction costs of more than $1.5 million upon early termination of the lease after 10 years. This type of partial risk shifting was absent from the agreement for the shell in *Hance*.

### E. Conclusion

All of this tends to indicate the State Police's relationship with the developer, while in part landlord-tenant, is also that of a customer hiring a developer to meet its specific construction needs. In my view, that is enough to decide this appeal.

Accordingly, I respectfully concur in the result.

Chief Justice Todd and Justice Brobson join this concurring opinion.